**A.B. DICK COMPANY, Plaintiff,**

v.

**BURROUGHS CORPORATION, Defendant.**

No. 78 C 75.

United States District Court, N.D. Illinois.

Sept. 10, 1985.

L. Michael Jarvis, Chicago, Ill., for plaintiff.

Dugald S. McDougall, Chicago, Ill., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW and JUDGMENT ORDER

SHADUR, District Judge.

A.B. Dick Company ("Dick") has sued Burroughs Corporation ("Burroughs") for patent infringement. After a bench trial (including the usual submission of voluminous documents), the parties have submitted post-trial cross-memoranda and responsive memoranda, as well as revised proposed findings of fact and conclusions of law (all of these also voluminous, though not needlessly so in light of the complex subject matter).

In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

### Findings of Fact

#### I. Parties and Proceedings

1. Dick is a Delaware corporation with its principal place of business in Chicago, Illinois. Dick is sole owner of United States Patent No. 3,596,275 (the "Sweet Patent") by written assignment from inventor Richard G. Sweet ("Sweet").

2. Burroughs is a Michigan corporation with its principal place of business at Burroughs Place, Detroit, Michigan. Burroughs has a regular and established place of business at 324 South Michigan Avenue, Chicago, Illinois.

3. This Court has jurisdiction over the parties and the subject matter of this action, and venue is properly in this District.

4. Gould, Inc. ("Gould"), originally a co-plaintiff in this action, was the owner of United States Patent No. 3,298,030 (the "Lewis-Brown Patent"), which has been held invalid in the Mead litigation (see Finding 6) before the trial in this case. By stipulation the Lewis-Brown Patent has been withdrawn from this case and Gould has been dismissed as a party.

5. Dick charges Burroughs with infringing the Sweet Patent by making and selling ink-jet recording equipment incorporated in its Non-Impact Endorser. Burroughs denies it has infringed the Sweet Patent and asserts the Sweet Patent is both invalid and unenforceable.

#### II. Mead Litigation

6. Two prior actions (collectively the "Mead litigation") have also involved the validity and claimed infringement of the Sweet Patent: *A.B. Dick Company and Gould, Inc. v. The Mead Corporation*, Civil Action No. C–3–78–287 and *Mead Digital Systems, Inc. v. A.B. Dick Company and Gould, Inc.*, Civil Action No. C–3–78–177, both in the United States District Court for the Southern District of Ohio. After a November 1980 consolidated trial in those cases, Honorable Walter H. Rice issued an opinion and judgment, 521 F.Supp. 164 (S.D.Ohio 1981):

> (a) holding the Sweet Patent valid but not infringed by Mead's apparatus and
>
> (b) holding the Lewis-Brown Patent invalid.

On appeal that judgment was affirmed, 723 F.2d 455 (6th Cir.1983).

7. To the extent this Court (based of course on the record in this case) reaches the same Findings as did Judge Rice in the Mead litigation, it will—rather than repeating those findings verbatim—simply adopt them, citing them "Mead Finding—" with a reference to the relevant page in 521 F.Supp.

#### III. Sweet's Development and the Sweet Patent

##### A. Sweet's Development

8. Sweet developed his ink-jet recorder at Stanford University in the early 1960s.

Funded by an Army Signal Corps contract, Sweet developed a technique for selective charging and deflection of individual ink droplets. In that respect, though the record in this action does not contain all the details referred to in Mead Findings 13–37, 521 F.Supp. 169–72, the substance of the record here is identical, and none of the differences is material to the issues in this case. This Court adopts Mead Findings 13–37.

9. Instead of charging his ink droplets uniformly and controlling their trajectories by varying the magnitude of a deflecting field (as had been done, for example, in the Inktronic machine produced by Teletype, based on United States Patent No. 3,060,-429 (the "Winston Patent")), Sweet used a constant deflection field and controlled the droplet trajectories by selectively charging the droplets, one at a time, as they were formed. Each droplet, at its instant of formation, was given an electric charge proportional in magnitude to the instantaneous value of "signal" voltage at that precise moment.

10. Sweet's development made possible higher recording speed with an ink jet, because with Sweet's technique the limiting factor on recording speed became the rate at which droplets were formed and charged, rather than the rate at which the droplets moved through the deflection field. Sweet was able to generate and charge individually more than 100,000 ink droplets per second, each one of which carried a tiny increment of "intelligence." Each droplet was deflected by the constant electric field to the precise degree needed to make it "land" where the signal voltage "commanded" it to land—either at some particular position on the paper or in an intercepting receptacle, positioned to catch droplets not used for recording.

11. Though Dick was not forthright on this score at trial,[1] there is no question but that the purpose of Sweet's development was to produce a better direct-writing "oscillograph," as the latter term is defined by the McGraw-Hill Encyclopedia of Science and Technology:

A measurement device for determining waveform by recording the instantaneous values of a quantity such as voltage, as a function of time. It consists of three major components: (1) a primary detector for sensing the instantaneous values of the quantity, (2) the timing system for introducing a time scale on the record, and (3) some means for recording the waveform.

12. Finding 11 is both informed and compelled by a host of factors, including the following:

(a) Sweet's original proposal to the United States Signal Corps involved an operative model of the device, which Sweet called a "Hydraulic Oscillograph."

(b) Sweet's Signal Corps project was entitled "High Frequency Direct Writing Oscillograph." All the monthly and quarterly reports, and the final report, issued on the project were entitled in the same way.

(c) After the reduction of his device to practice, Sweet sought to interest various companies in the development of the device. He wrote to some eight companies, *all* of whom were suppliers of oscillographs or recorders.

(d) Honeywell's patent attorney Lockwood Burton ("Burton"), who had the responsibility for preparing the patent application pursuant to Sweet's exclusive license agreement with Honeywell, sent the draft application to Sweet with a May 6, 1963 letter entitled "Patent Application on High Frequency Direct Writing Oscillograph." Burton said in his letter:

I have prepared a draft for a patent application to cover the oscillograph

---

1. That may however be viewed as permissible advocacy, for courts are expected to sift through competing arguments in resolving the factual and legal issues. Such advocacy should be contrasted with Sweet's misconduct in the ex parte proceedings in the Patent and Trademark Office

("PTO"), dealt with in later Findings and in the Conclusions, where the crucible of the adversary process is not available and applicants and their lawyers are properly held to higher standards.

which is the subject matter of your agreement with Honeywell.

As Burton testified via deposition in joint discovery in this and the Mead litigation:

Q. Did you consider that Mr. Sweet had developed an invention in the field of oscillography?

A. Yes.

Q. In any other field?

A. No other field was concerned.

(e) Sweet himself testified at the Mead trial:

Q. .... And the first object [of the Sweet Patent], let's take the second paragraph. Which states, "This invention relates to signal apparatuses and more particularly to a direct writing signal recording system."

A. Yes.

Q. I take it from that that what you were disclosing in your patent was a system to record an electrical signal?

A. Yes.

Q. Now, in the first object, it says, "It is an object of the present invention to provide an improved recording system which is capable of recording a wide band of input signals which may vary in frequency from direct current signals to signals having frequencies in the kilocycle range."

A. Yes.

Q. Was that the primary object of your invention?

A. Yes.

Q. Doesn't that define an oscillograph?

A. Yes, I think so.

Q. All right. In the conclusion of the specification, in the last paragraph, in column 11 of the patent, you state that, "It may be seen that there has been provided in accordance with the present invention a graphic recorder for the direct writing of signal information which may cover a wide band of signal frequencies."

A. Yes.

Q. Now, isn't that description synonymous with oscillograph?

A. Yes.

And see Mead Finding 53, 521 F.Supp. at 173.

13. Sweet's device initially contained the following elements:

(a) means for supplying ink under pressure;

(b) a nozzle or orifice from which the ink could issue as a free jet;

(c) a means for causing the jet to break up into regularly-spaced droplets of uniform size;

(d) a charging electrode for independently charging the individual ink droplets in proportion to the instantaneous values (at the moments of droplet formation) of the varying voltage applied to the electrode;

(e) a pair of deflection plates carrying a uniform electric field to deflect the droplets;

(f) a recording surface; and

(g) a transport system for advancing the recording surface.

14. Thereafter, to eliminate the problem of "puddling" (the result of excess ink when the paper recording surface is moving slowly or when the waveform being recorded is not changing quickly), Sweet developed a means for deflecting unwanted or excess ink droplets to a catcher that intercepted them before they reached the recording surface. That deflection and nonrecording of some of the droplets would still give an apparently cursive representation of the incoming waveform, but one of lesser intensity and a cleaner appearance. As Burton testified:

Q. What was the purpose of the catcher or dump that is disclosed in the Sweet continuation-in-part application, Mr. Burton?

MR. ROCKEY: Are you asking for his present-day interpretation?

BY MR. GOLDSTEIN:

Q. I am asking for your interpretation as you understood it at the time the application was filed.

A. To catch a portion of the ink drops as they were being transported from the nozzle to the paper.

Q. For what purpose?

A. To vary the intensity of the recording.

Q. If you review the application,—

A. Right.

Q. —Mr. Burton, I believe there are two different uses for this dump or catcher, one of them being to catch every nth drop and the other being to catch drops in response to changes in the incoming signal. So that you don't have just one drop when the chart speed slows down or the signal changes to some extent; is that correct?

A. That's right.

Q. Did Mr. Sweet ever disclose to you the use of the catcher or dump to catch unwanted drops in printing alphanumeric characters?

A. In this application, no.

Q. In that application?

A. No.

Q. Is that disclosed in that application?

A. Not that I know of.

### B. Sweet's Patent Applications and Dick's Ownership

15. After making his invention, Sweet entered into a license agreement with Minneapolis-Honeywell ("Honeywell"), granting it an exclusive license under his invention with the right to grant sublicenses, subject to an existing license to the United States Government. Because Sweet's invention had been financed by an Army contract, he was obligated to, and did, grant to the United States a royalty-free, non-exclusive license.

16. Sweet's first patent application was filed by Honeywell on Sweet's behalf July 31, 1963. On March 31, 1964 the application was superseded by a continuation-in-part application ("CIP"), disclosing additional material related to the catcher (see Finding 14), its purpose and its associated circuitry.

17. During the prosecution of the Sweet CIP application, the Patent Office cited a number of prior art references, many but not all of which have been relied on by Burroughs here. After a lengthy prosecution, the Patent Office allowed Sweet's CIP application and it issued July 27, 1971 as the Sweet Patent.

18. On May 9, 1966 (Honeywell's license having been converted to a non-exclusive license in the meantime) Dick entered into an exclusive license with Sweet, subject to licenses already outstanding. On September 19, 1972 Dick bought the Sweet Patent outright, subject to outstanding licenses.

### C. Prior Art and the Sweet Patent

19. Mead Findings 7–12, 521 F.Supp. at 168–69 deal with some but not all of the prior art relevant to the Sweet Patent, and this Court adopts those Findings. Other relevant prior art cited by Burroughs in this case includes Hansell United States Patent No. 1,941,001 (filed in 1929), still another article by Professor Magarvey (this one published in 1957) in addition to those identified in Mead Finding 11, and an article published in March 1962 by Burroughs' expert witness in this case, Dr. Hendricks. As later Findings reflect, the prior art did not render the Sweet Patent invalid for obviousness, though some of it bears importantly on the issue of enforceability dealt with in later Findings.

20. Like Sweet's invention (see Findings 11–12), the Sweet Patent was limited to oscillography—to the disclosure of an oscillographic method and recorder. It is true the Mead litigation involved only Sweet Patent claims 1 and 33, while this action charges Burroughs with infringement of Sweet Patent claims 1, 3, 4, 10–13, 15, 16, 18, 24–26 and 30–33. Nonetheless Mead Findings 48–71, 521 F.Supp. at 173–75 are equally applicable to all the claims in suit here. That is so because at least one element of each of the claims asserted in this action, taken in the overall context of the respective claims as well as the objects, description and prosecution history of the Sweet Patent, is plainly directed to an oscil-

lographic method or oscillographic recorder. Those claim elements of primary interest to this action (with each number corresponding to a claim and each letter corresponding to an element within that claim) are respectively 1(g), 4(d), 10(d), 11(e), 13(g), 24(i), 25(d), 30(d) and 33(e). This Court adopts Mead Findings 48–71 and applies them to all the claims in suit.

21. Dick advances the truism that the word "recorder," used throughout the Sweet Patent, has meanings other and broader than the term "oscillograph" (which is not specifically used in the Sweet Patent). That is really irrelevant. In accordance with the testimony of Dr. Hendricks, this Court finds the common usage in the relevant fields of science, at the time the Sweet applications were filed in 1963 and 1964, was to use the terms "oscillograph" and "recorder" synonymously. Sweet and his patent lawyer so used the term "recorder" and other variants of that term in the Sweet Patent to speak solely of the oscillographic use of Sweet's invention. As Mead Finding 71, 521 F.Supp. at 175 said and this Court finds independently:

It is clear that through such characterizations of Magarvey and Blackford and through the amendments to the claims that Sweet made in response to the rejection of the claims as fully met by Magarvey and Blackford, a picture of the incoming waveform is reproduced on paper by recording as a function of time the magnitude of deflection of each droplet in a succession so that the succession of deflected droplets trace the waveform on paper. That is the function and operation of an oscillograph.

22. In dealing with the same issue in a different context, the Court of Appeals for the Sixth Circuit said (723 F.2d at 457–58):

In order to prevail on this issue, [Dick and Gould], as we see it, must satisfactorily answer two related questions. First, if the Sweet patent contemplated calligraphy as well as oscillography and in application could compose characters as well as curved lines, why does not the patent say so directly and explain the process unambiguously? Why is this claim left unclear if it was intended? Second, if the Sweet patent claimed high speed character writing and needed no significant improvement or fundamental change to do so, why did Sweet join with Dr. Cumming, his supervisor, in subsequently filing a second, separate patent application disclosing a more advanced multiple ink jet system clearly designed for high speed character writing?

[Dick and Gould] have failed to answer these questions satisfactorily and have failed to carry their burden of proof on the issues.

This Court independently makes the same finding as to Dick as embodied in the just-quoted language, although it should be emphasized that finding was made in the context of contrasting the Sweet Patent's teaching with a device using a multiplicity of ink jets from a number of orifices, as to which Mead Findings 106–07, 521 F.Supp. at 179 state:

106. In one sense, a single orifice on the Mead DIJIT is capable of producing one waveform. A single orifice operating without signal disturbance traces a line characteristic of the lack of disturbance. A line is a waveform. Moreover, a single orifice is capable of producing a linear waveform with periodic discontinuities. However, each orifice is incapable of producing a continuous waveform characteristic of a variable signal, and each orifice is incapable of producing common alphanumeric or geometric configurations.

107. The DIJIT printer achieves its desired function only through the combined results of the multiple orifices acting in cooperation with each other. Each single jet alone achieves no useful result. The DIJIT printer does not seek to trace on paper the incoming signal to a charge tunnel or tunnels; rather, the ink droplets, through the collective arrangement of the orifices and coordinated interception of droplets, create a composite picture unlike the incoming signals. The final picture is alphanumeric or graphic

information which is not characteristic of the charging signals to the charging tunnels.

### D. Comparative Speed of the Sweet Device—An Irrelevancy

23. Dick contends (and contended in the Mead litigation) that the Sweet invention resulted in recording speeds "hundreds of times faster than the prior art," referring particularly to the Teletype Corporation's "Inktronic" printer taught by the Winston Patent. That characterization is wholly misleading, for it is based on dividing the Inktronic speed of 120 characters per second by 40 (the number of separate nozzles in the Inktronic printer) to derive as a quotient a "speed" of three characters per second per nozzle, as compared with 250 characters per second in Dick's printer based on the Sweet device. In fact the nozzles in the Inktronic printer operate sequentially rather than simultaneously, so that the relevant comparison is between the Inktronic speed of 120 characters per second and the Sweet-device speed of 250 characters per second. Burroughs accurately says the result of Dick's mischaracterization was to sell a bill of goods to the Court of Appeals for the Sixth Circuit, which said in the course of affirming Judge Rice's opinion, 723 F.2d at 459 (emphasis added):

> Sweet found that he could generate as many as 120,000 droplets per second, resulting in a recording speed *hundreds of times faster than the Winston device could achieve.*

Apart from mere hyperbole (by which 250/3 somehow becomes "hundreds of times" rather than 83⅓, an odd result in the field of patent law in which parties pride themselves on technical precision), that reflects a kind of needless overreaching on Dick's part.

24. All the parties' discussion of the matter referred to in Finding 23 is really beside the mark. It does not affect the validity of the Sweet Patent, or its claimed infringement by the Burroughs device, that the Sweet-taught printer can more accurately be characterized as about twice as fast as the Winston Inktronic Printer rather than "hundreds of times faster."

### E. Obviousness

25. For purposes of determining the obviousness vel non of the Sweet Patent, the ordinary skill of the art in the fields relevant to that patent in the early 1960s, including the date of Sweet's invention, involved electrical engineers or physicists with at least a bachelor's degree and with several years' experience in the general fields of physics or electrical engineering or in the specific fields of oscillographic recording or drop formation.

26. None of Burroughs' prior art references discloses a device for permanently recording variable electronic signals by constant field deflection of selectively charged discrete ink droplets projected toward a recording medium. No such device was known in the art prior to Sweet's work.

27. It is true that a number of the basic elements of such a device had been known in the art for at least 30 years before Sweet's work (i.e., Lord Rayleigh's study of drop formation phenomenon in conjunction with Schroter's disclosure of a variably charged ink jet for recording purposes). But that fact, together with the lack of reduction to practice of any such device until Sweet's work, is indicative that such a device was not obvious to a person of ordinary skill in the art prior to Sweet's work. Magarvey's repeated disclosures of a discrete droplet charge system beginning more than five years before Sweet's work, and the absence of any recording purpose or use of such a system until Sweet's work, lend support to this Finding.

28. Burroughs engages in a kind of reconstructive process, drawing bits and pieces from each of several components of the prior art, to urge the aggregate of those bits and pieces adds up to obviousness to a person of ordinary skill in the art before Sweet's work. This Court finds that hindsight process (if it is indeed ever

appropriate) does not operate in this instance.

29. Taking into account (a) the scope and content of the art prior to Sweet's work, (b) the differences between that prior art and the claims at issue in this action and (c) the level of ordinary skill in the art at the time of Sweet's work, the claimed invention (properly viewed as one for the purpose of oscillographic recording) was not known in the art prior to Sweet's work and would not have been obvious to a person of ordinary skill in the art prior to that time. Nor is that conclusion of non-obviousness changed by the fact that, by altering the nature of the input signal to the device claimed by Sweet's patent, it was possible to use the same device (still in an oscillographic manner) to print alphanumeric characters rather than to reproduce all of the input waveform.

## IV. Infringement by Burroughs

30. Burroughs' total Non-Impact Endorser machine, which includes the accused device, is an alphanumeric character printer. Unlike the original purpose of Sweet—that of reproducing a usually continuous waveform (the sine wave is the archetypical example) but suppressing some of the droplets to avoid excess intensity (or puddling) of the replicated waveform—*most* of the droplets are suppressed in the printing of the Burroughs characters. Only preselected droplets are permitted to go through to the recording paper surface, thus depicting the intended letter or numeral.

31. Burroughs' total machine requires (and has) a highly sophisticated means of input to the portion of Burroughs' machine that corresponds to the Sweet-taught device. That input is a function of complex electronic circuitry that delivers pulses as the input signal to the Sweet-taught device. There is always at least one uncharged

drop (which is intercepted by the catcher and returned to the ink supply) between two charged drops (which are deflected upward toward the moving document). That means not *every* instantaneous variation in the input signal is recorded. But there is no gainsaying (a) the input signal is variable and (b) at least some instantaneous values of that signal are in fact recorded. In that sense "a picture of [preselected portions] of the incoming waveform is reproduced on paper by recording as a function of time the magnitude of deflection of each [preselected] droplet in a succession so that the succession of deflected droplets trace [those portions of] the waveform on paper" (see Finding 21, recapitulating and independently reconfirming Mead Finding 71). As Finding 21 reflects, that too is the function and operation of an oscillograph.

32. To restate the Burroughs device in Sweet Patent terms, Burroughs' ink-jet recorder includes a nozzle [2] fed with ink under pressure from a reservoir, the ink being vibrated at 253,000 cycles per second. That yields a stream of uniformly-sized, evenly-spaced droplets. Burroughs also includes a charging electrode spaced from the nozzle, which charges each discrete droplet as it is formed to a level determined by the instantaneous magnitude of the charging-electrode voltage at the moment of droplet formation. All droplets, after being charged, pass through a constant unidirectional electric field that deflects the droplets proportionally to their respective charges. Droplets having a zero charge level, being undeflected, are deposited in a catcher, whereas the deflected droplets are deposited on the record surface to form characters or symbols predetermined by the waveform of the charging-electrode voltage.

33. Burroughs' ink-jet recorder is controlled by voltage signals applied to the

---

**2.** In fact the Burroughs device has four nozzles, but each one produces a separate line of alphanumerical characters on its own, without interaction of the others, solely in a transverse direction to the moving paper on which the characters are printed. That is in total contrast to the device involved in Mead (see Mead Findings

106–07, reproduced in this Court's Finding 22). For simplicity in treatment, these Findings will refer only to a single nozzle in the Burroughs device (of course the presence of four infringing nozzles rather than one makes no difference in the result).

machine's charging electrode. Records made by the Burroughs recorder replicate the waveform envelopes of those signals. Burroughs' machine samples the changing voltage on its charging electrodes at predetermined spaced time intervals and records the successive voltage values at each sampling instant, just as the machine depicted in the Sweet Patent is capable of doing. Burroughs' recorder is thus an oscillograph that will record a sine wave (or any other voltage waveform) if appropriate voltages are applied to its charging electrode.

34. In terms of the principal claim elements of the Sweet Patent in dispute, claim element 1(g) reads:

> applying variable electrical signal values representative of the desired deflections to the charging electrode whereby individual droplets are electrostatically charged to effect different charges on at least some droplets of the succession.

Corresponding claim element 4(d) (one of the means claims) reads:

> means for electrostatically charging said discrete droplets in accordance with the instantaneous values of a variable signal input to effect different charges on at least some droplets of the succession.

All those things are in fact done in an oscillographic recording manner in the Burroughs machine (albeit not with the same kind of waveform—the same kind of "variable signal input"—originally contemplated by Sweet).

35. It is profitable to contrast the situation described in Finding 34 with Mead Findings 123–25, 521 F.Supp. at 180–81, which found the Mead printer did not infringe the Sweet Patent. Judge Rice found the Sweet Patent claims must be "interpreted to describe *only* deflection transverse of the time-axis of relative movement between the record member and nozzle, and thus define only oscillography" (Mead Finding 124, emphasis in original). In this case the Burroughs device *does* deal only with such transverse deflection—that is, oscillography—and literally infringes the Sweet Patent claims. Burroughs' printer (unlike Mead's) has only a single orifice,[3] and that orifice performs substantially the same function in substantially the same manner to produce substantially the same result as claimed in the Sweet invention.

36. In sum, the portion of the Burroughs machine claimed as infringing by Dick corresponds to the "pencil" of which the Court of Appeals for the Federal Circuit wrote in the earlier appeal in this case, 713 F.2d 700, 703 (Fed.Cir.1983):

> For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write. Neither would infringement be negated simply because the patentee failed to contemplate use of the pencil in that environment.

Even properly limited to oscillography, the Sweet Patent is infringed by Burroughs.

## V. Inequitable Conduct

37. There is no question but that Dick[4] engaged in more than one respect in what the Court of Appeals for the Federal Circuit has come to call "inequitable conduct in the PTO," rather than the old label "fraud in (or less accurately 'on') the PTO." Because such conduct as to the Magarvey articles (see Mead Finding 11, 521 F.Supp. at 168–69 and this Court's Finding 19) is most clearly material, the circumstances as to the Magarvey articles will be reviewed in greatest detail in the following Findings.

---

**3.** This is true for each line of recorded information (see n. 1).

**4.** As the following Findings and Conclusions reflect, the conduct involved was that of Sweet and his lawyers. It is not clear to this Court whether each of the lawyers representing Sweet before the PTO after Dick acquired its exclusive license in 1966 was really a lawyer selected by Dick (which had by then become the principal party in interest). That however makes no difference, for Dick stands in Sweet's shoes so far as inequitable conduct and its consequences are concerned. It should be emphasized that the offending lawyers referred to in these Findings and Conclusions are *not* Dick's trial counsel in the present proceeding.

38. Sweet himself early characterized his claimed invention in a May 16, 1963 letter to his attorney Burton:

It seems to me that the most important part of the system is that portion that forms, charges, and projects the ink droplets.

At least by later that year Sweet knew of the Magarvey articles, which disclosed material matters bearing on that "most important part" of Sweet's claimed invention. Indeed in March 1964 (just before his CIP application was filed) Sweet completed his final report on "High Frequency Oscillography with Electrostatically Deflected Ink Jets," listing the Magarvey articles in addition to the Jacob Patent (see Mead Finding 9, 521 F.Supp. at 168) and the Waage article (see Mead Finding 10, 521 F.Supp. at 168). Later in 1964 Sweet's article submitted to the *Review of Scientific Instruments* stated:

Recently, Magarvey and Blackford ... have reported on techniques for forming, charging, and deflecting water drops, using methods similar to those described here.

Despite that knowledge on Sweet's part, his CIP application did not call the Magarvey articles to the PTO's attention, and his accompanying oath stated Sweet knew of no anticipating prior art.

39. Except for the interference proceeding that Sweet's second lawyer requested in 1967 (having precipitated the matter by filing a June 29, 1967 amendment that included claims copied from the Lewis-Brown Patent), a patent would *then* have issued on the entire Sweet CIP application. As Finding 40 reflects, that patent would have included claims that were rejected three years later (July 31, 1970, some seven years after filing of the original Sweet application) on the specific strength of the Examiner's citation of the Magarvey articles.

40. In April 1970, after the interference proceeding had terminated in favor of Lewis-Brown, Sweet and his lawyer corresponded between themselves about the remaining claims as to which priority of invention

had not been awarded to Lewis-Brown (that is, the very same claims that had been in the CIP application). On June 29, 1970 they amended only *one* of those remaining claims to distinguish from Waage, without however amending even broader claims (as would have been required) to distinguish from the Magarvey articles. That June 29, 1970 amendment accurately stated all then-pending claims 1 to 31 had been allowed (those claims from the CIP application had in fact been allowed in 1967, when the interference was declared as to claims copied from the Lewis-Brown Patent), and the amendment went on to say that its purpose was to place the application in condition for "immediate allowance." Sweet's lawyer did not call attention in that amendment either to the Waage reference that had led to the amendment of one claim (despite Sweet himself having characterized that reference as "the closest prior art that I am aware of") or, even more significantly, to the Magarvey articles.

41. On July 31, 1970 an office action issued in which the Examiner specifically cited the Magarvey articles and rejected nine of the pending claims as "fully met" by Magarvey. From the facts that (a) the patent would have issued on the Sweet CIP application in 1967 but for the interference action, all CIP claims then having been allowed, and (b) the Examiner rejected claims from the CIP application in 1970 as "fully met" by the Magarvey articles, it is clear the Examiner had fortuitously obtained knowledge of Magarvey in the interim. Whether that knowledge was obtained as the result of those articles having been referred to among a large number of references in one of a large number of exhibits filed by Sweet in the interference proceeding, or whether the knowledge was obtained as the result of the Examiner's own independent efforts, is not relevant for current purposes. What *is* relevant is that Sweet's lawyer, after having conferred with Sweet, asked for "immediate allowance" of all claims without making *any* reference to Magarvey.

42. As evidenced by the Examiner's ultimate rejection of various claims on the strength of Magarvey, the Magarvey articles are material under any standard. Sweet's knowledge of the Magarvey articles and their disclosure, coupled with his own characterization of those articles and his direct knowledge of the PTO office actions, reflects a specific intent (again under any relevant standard) not to disclose that material information to the PTO in conjunction with the request for allowance of all claims and issuance of a patent encompassing them.

43. Burroughs also asserts inequitable conduct in connection with the Waage article, the Winston Patent (see Mead Finding 12, 521 F.Supp. at 169) (the latter in conjunction with facts as to office actions taken on Sweet's German patent application) and the Jacob Patent. As to the Jacob Patent, that assertion does not meet the standard of "clear and convincing evidence"—as the Magarvey situation plainly does. But Waage may bear, and Winston certainly does bear significantly, on the issue of inequitable conduct:

(a) Waage may not meet the standard of materiality, because Sweet and his lawyer themselves ultimately amended a claim to distinguish from Waage, and Judge Rice (Mead Findings 138–40, 521 F.Supp. at 182) accurately found Waage's work either more remote or cumulative to other prior art ultimately known to the PTO before the Sweet Patent issued (referring specifically to the Magarvey articles). But Sweet's nondisclosure of Waage, despite his having characterized it as the "closest prior art," may be viewed as corroborative of Sweet's *intent* in nondisclosure of the Magarvey articles.

(b) More significantly, when the Examiner rejected numerous claims as "fully met" by Magarvey, Sweet and his counsel jointly worked out and filed a response that, after asserting differences between Sweet's work and the Magarvey articles, said an Examiner-cited article by Dr. Hendricks "discloses apparatus for forming a jet spray which is somewhat similar to what is disclosed in Winston," which was identified in the response as having been cited by the Examiner long before. In the very next paragraph of that response Sweet and his counsel urged Sweet's invention did not employ a spray type jet, but a single file of uniform drops. In the context of Sweet's response that was an affirmatively misleading representation, for *Winston* disclosed a single file of uniform drops— and the clearly intended implication of the response was that Sweet's use of a single file of drops distinguished it from the prior art because the prior art had not disclosed such a use. Nothing in the response, with its offhand earlier reference to Winston,[5] pointed the Examiner toward a fresh look at Winston, which would have disclosed the misleading character of the distinction asserted by Sweet. Though it is not possible to make a definitive finding of materiality (because it is unknown what the Examiner's reaction to an accurate Winston reference would have been), Sweet's conduct certainly bears on the intent issue and corroborates the prior Findings as to intent in connection with the Magarvey articles.

44. Neither Sweet nor his lawyers testified at trial, though Sweet was contractually committed to Dick to do so. That failure too serves to corroborate the prior Findings as to Sweet's intent.

---

**5.** It is not dead certain whether the locution employed in the response was disingenuous or only careless (if the latter, note the authorities' use of "gross negligence" as satisfying the intent requirement of inequitable conduct). Hendricks may indeed have disclosed an *apparatus* "somewhat similar" to that of Winston. But in the phrase quoted in the first sentence of this Finding 43(b), the immediate antecedent of

"which is somewhat similar" was "jet spray" and not "apparatus"—and the essence of the patent application practice is the precise use of language. Winston did *not* disclose a jet spray, and the single file of droplets it *did* disclose (as Sweet's work did later) was the specific focus of the lawyer's and Sweet's substantive argument— advanced by them in their successful effort to distinguish Sweet's work from the prior art.

*Conclusions of Law*

*Burden of Proof*

1. This Court has jurisdiction over the parties and the subject matter of this action. Venue is properly in this District.

2. Under 35 U.S.C. § 282 a presumption of validity attends a patent grant, with the burden of proving invalidity imposed on the party asserting it. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358–60 (Fed.Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Proof of invalidity must be by clear and convincing evidence. *Atlas Powder Co. v. E.I. duPont de Nemours & Co.*, 750 F.2d 1569, 1573 (Fed.Cir.1984).

3. As to inequitable conduct by the patentee, the burden of proof is similarly upon the party who asserts it (here Burroughs), and the standard of such proof is similarly "clear and convincing." *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1984).

4. On the issue of infringement, the burden of proof is on the patent owner (here Dick) to prove infringement by a preponderance of the evidence. That includes literal infringement and, if applicable, infringement under the doctrine of equivalents. *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985).

*Obviousness and Validity*

5. Under 35 U.S.C. § 103 an issued patent is not valid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

6. In *Graham v. John Deere & Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) the Supreme Court directed that the following basic factual inquiries precede a determination of the legal issue of obviousness:

(1) the scope and content of the prior art are to be determined;

(2) differences between the prior art and the claims at issue are to be ascertained; and

(3) the level of ordinary skill in the pertinent art is to be resolved.

Though secondary considerations may also be utilized, they need not be resorted to if the issue of obviousness may be clearly determined from the primary factors just outlined.

7. This Court has made the basic factual inquiries referred to in Conclusion 6. As the Findings (and particularly Findings 25–29) reflect, Burroughs has not sustained its burden of proving obviousness by the requisite clear and convincing evidence.

8. Except for the factor of inequitable conduct by Sweet and his lawyers (which is ascribable to Dick as the present owner of the Sweet Patent), Sweet Patent claims 1, 3, 4, 10–13, 15, 16, 18, 24–26 and 30–33 would be good and valid in law. As *Stevens*, 747 F.2d at 1559–62 teaches, inequitable conduct more appropriately leads to a conclusion of patent unenforceability (as a whole, not merely as to affected claims) rather than patent invalidity.

*Unenforceability*

9. Proceedings in the PTO are ex parte and conducted in secret. 35 U.S.C. § 122; 37 C.F.R. § 1.14. Accordingly patent applicants and their counsel stand in a "relationship of trust" to the PTO. That relationship imposes the highest standards of honesty and candor on the part of an applicant and his counsel in presenting information to the PTO, for such standards are necessary elements if the patent system is to work. *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949) (per curiam).

10. Applicants and counsel before the PTO are subject to PTO Rule 1.56 (37 C.F.R. § 1.56):

Duty of disclosure; fraud; striking or rejection of applications.

(a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, [and] on each attorney.... All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

\* \* \* \* \* \*

(d) No patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or gross negligence. The claims in an application shall be rejected if upon examination pursuant to 35 U.S.C. §§ 131 and 132, it is established by clear and convincing evidence (1) that any fraud was practiced or attempted on the Office in connection with the application, or in connection with any previous application upon which the application relies, or (2) that there was any violation of the duty of disclosure through bad faith or gross negligence in connection with the application, or in connection with any previous application upon which the application relies.

 11. Violation of the applicant's "duty of candor" to the PTO, established by clear and convincing evidence, constitutes "inequitable conduct." *Driscoll v. Cebalo*, 731 F.2d 878, 884 (Fed.Cir.1984); *Stevens*, 747 F.2d at 1559. "Inequitable conduct" is a broader concept than common law fraud (*id.* at 1559), embodying instead the equitable requirement of "clean hands." *Driscoll*, 731 F.2d at 884. If inequitable conduct is established as to *any* claims of a patent, that patent is unenforceable *in its entirety*. As *Stevens*, 747 F.2d at 1561 put it:

> Once a court concludes that inequitable conduct occurred, all the claims—not just the particular claims to which the inequitable conduct is directly connected— are unenforceable.

 12. Inequitable conduct is a function of two factors: materiality and intent. *Stevens*, 747 F.2d at 1559–60. This Court's function is to determine whether those factors are present in sufficient degree to constitute inequitable conduct. *Stevens*, 747 F.2d at 1560. Those factors interact in a sliding scale fashion: the greater degree that one is present in a situation, the lower the required threshold for the other. *American Hoist*, 725 F.2d at 1363.

13. As to the requirement of materiality, *Stevens*, 747 F.2d at 1559 has identified four possible criteria by which it may be ascertained:

(1) objective "but for";

(2) subjective "but for";

(3) "but it may have been"; and

(4) PTO Rule 1.56(a): whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent.

Of those four possibilities, the standard of PTO Rule 1.56(a) "is the appropriate starting point because it is the broadest and because it most closely aligns with how one ought to conduct business with the PTO." *Id.; American Hoist*, 725 F.2d at 1363.

14. In this instance it is indisputable that the undisclosed Magarvey articles satisfied the PTO Rule 1.56(a) standard, for the Examiner *in fact* considered them important in deciding whether to allow various of the claims in the application to issue as a patent. Here the proof of the pudding was in the eating, for the Examiner's discovery of those articles actually (not just hypothetically) caused him to reject previously allowed claims as to which the patent had been ready for issuance. Indeed the situation as to the Magarvey articles would unquestionably satisfy *each* of the four standards of materiality.

 15. Although this Court has not set out the facts as to Sweet's other materially misleading conduct (primarily (a) the nondisclosure of the Waage article despite Sweet's then-current characterization of

Waage as the "closest prior art" known to him and (b) the misdescription of the Winston patent) with the same degree of detail as the Magarvey situation, such misconduct clearly occurred as well. Those added matters bring into play the principle that while the making of a single material misrepresentation, or the withholding of a single piece of material information, may alone suffice to establish inequitable conduct, a pattern of such actions or omissions clearly indicates a disdain for the administrative process that cannot be rationalized as an honest mistake, and such a pattern provides strong support for a ruling of inequitable conduct. *Driscoll*, 731 F.2d at 885.

■■■ 16. As to the requirement of intent, that may be satisfied in either of two ways:

(a) Actual subjective intent may be proved, though that need not be by direct evidence (*Stevens*, 747 F.2d at 1560):

It may be proven by showing acts the natural consequences of which are presumably intended by the actor.

(b) Gross negligence is equally sufficient (*id.*):

Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of a withheld reference.

In the latter respect, subjective good faith cannot avoid a holding of inequitable conduct if materiality and gross negligence are present in a sufficient degree. *Argus Chemical Corp. v. Fibre Glass-Evercoat Co.*, 759 F.2d 10, 14–15 (Fed.Cir.1985).

■■■ 17. Where an applicant or his attorney knew of a reference and knew, or should have known, that the reference is material (in the PTO Rule 1.56(a) sense), failure to disclose the reference is sufficient proof to establish intent. *Stevens*, 747 F.2d at 1560, 1564; *Driscoll*, 731 F.2d at 885.

■■■ 18. Balancing materiality and intent (see *American Hoist*, 725 F.2d at 1363), materiality was at the highest possible level in this case as to a substantial number of claims as to which a patent would have issued—and as to which the failure to issue the patent did not result from any disclosure by Sweet or his lawyer. Consequently, whether the activity by Sweet and his lawyer were to be viewed as deliberate scheming or merely gross negligence (or somewhere in between), inequitable conduct has been established by clear and convincing—indeed by documentary and undisputed—evidence. There was clearly an intentional withholding of at least the Magarvey and Waage articles, and it is also difficult to believe the misleading of the Examiner as to the true nature of the Winston device, once the Magarvey articles were cited by the Examiner, was not deliberate. This Court finds, on the strength of the other intentional withholding of material information, the misleading statement as to Winston was part of the same pattern.[6]

19. In an effort to make the worse appear the better cause, Dick seeks to invoke *Kimberly-Clark Corp. v. Johnson & Johnson*, 747 F.2d 1437, 1457 (Fed.Cir.1984):

In a case such as this, involving an issued patent attacked for breach of the duty of candor only on the basis of nonfeasance consisting of a failure to disclose known prior art, the key issues of materiality and intent should be decided with reference to the claims of the patent.

Dick also points to dictum in *Stevens*, 747 F.2d at 1563:

If the primary examiner actually knew about the Weiss and DaGasso references when examining the '912 application, that knowledge might preclude a finding of materiality.

And *Kimberly-Clark*, 745 F.2d at 1455 referred to the patentee's claimed efforts to

---

6. It is worth noting that neither Sweet nor his lawyer testified, though Dick had listed Sweet as a trial witness and he was contractually bound to Dick to testify. If it were necessary (and it is not under the circumstances), that would provide added inferential evidence of the element of intent.

mislead the examiner, "none of which, incidentally, is directed to the patented claims in suit but only to original claims which the examiner found adequate reasons for rejecting without recourse to [the nondisclosed prior art] and which were finally cancelled or substantially amended." All these authorities are urged in the context of Sweet's tainted claims not having been actually allowed—a sort of "no harm, no foul" argument. But that is a myopic view of what is after all an equitable doctrine, the patent-law equivalent of "clean hands." *Driscoll,* 731 F.2d at 884.

20. It is not enough for Dick to point out (for example) that the Magarvey articles were listed in Sweet's final project report, which was relied upon by Sweet as an exhibit in his interference proceeding against the Lewis-Brown Patent. First of all, the PTO cannot realistically be thought of as the equivalent (say) of a small law office, in which notice to one person may fairly be deemed notice to all. It is not necessarily true that the PTO Examining Division will have access to proofs filed in the course of an interference. *General Electric Co. v. United States,* 206 U.S.P.Q. (BNA) 260, 278 (Ct.Cl.1979). More important in equitable terms, Sweet sought to advance his own ends by using his final report to prove dates in the interference proceeding—but once the interference proceeding was over, he made no effort to cite either the Magarvey articles or the Waage reference to the Examiner in the context of Sweet's request for issuance of the patent on all the earlier-allowed claims (a request asserted as entitling the patent to be issued as a really automatic proposition). That kind of initial disclosure of prior art in the interference proceeding (as one of a large number of references in one of a large number of exhibits) does not satisfy the applicant's duty of candor—particularly where the prior art had been undisclosed for some years before that and later remained undisclosed by the applicant at the time he was urging issuance of the patent on the theory all the remaining claims had already passed muster.

21. *Driscoll,* 731 F.2d at 884–85 stands squarely for the hardly-surprising proposition that inequitable conduct is not magically erased by the fact the patent did not ultimately issue on the tainted claims. Though the facts in *Driscoll* are not of course precisely parallel, they are sufficiently analogous that parts of the opinion might well have been written for this case. *Driscoll, id.* at 884 said:

What is relevant is that the board found that a reasonable examiner would have considered such prior art important in deciding whether to allow the parent application. 37 C.F.R. § 1.56(d) (1982). *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1362, 220 USPQ 763, 773 (Fed.Cir.1984).

In Interference No. 97,757, the board said:

Accordingly, reprehensible as Cebalo's conduct may have been, and we consider it to be quite reprehensible, we are constrained to find no fraud because there was no reliance by the Examiner upon Cebalo's violation of his duty to disclose.

This was error.

And *id.* at 885:

Moreover, an applicant who, with gross negligence, has withheld from the PTO prior art material to a claim in a parent application should not be exculpated simply because, by fortuitous circumstances, the PTO has not reached the stage of allowing claims in a continuing application.

That principle applies a fortiori where (as here) the applicant's (now the patentee's) conduct likely reflects an actual misleading intention rather than "mere" gross negligence. *Kimberly-Clark* does not call for a different result for two reasons:

(a) That case, 745 F.2d at 1457 accurately spoke of claims "rejected by the examiner as unpatentable for reasons not involving the uncited prior art. To base a conclusion of 'fraud' on such grounds is to deal with a hypothetical situation, not with reality." Here the situation was not at all hypothetical, for

the Examiner rejected numerous claims *specifically* because of the Magarvey articles. That is surely "reality" in *Kimberly-Clark* terms.

(b) *Kimberly-Clark, id.* at 1454 (emphasis in original) stressed:

There is no suggestion of anything related to real fraud, such as *false or misleading* statements; we deal only with non-disclosure. The question is the legal effect of nonfeasance, not malfeasance.

As already stated, the circumstances of nondisclosure in this case were of the egregious type that satisfy *Driscoll* and differ sharply from the facts in *Kimberly-Clark*. Additionally, at least in part (the Winston patent situation) Sweet's characterization was affirmatively misleading.

22. Dick's inequitable conduct might well be the predicate for finding this case exceptional, so as to trigger the award of attorneys' fees under 35 U.S.C. § 285. *Hughes v. Novi American, Inc.*, 724 F.2d 122 (Fed.Cir.1984). But given the enormous amount of time spent in this litigation on substantive issues on which Dick and not Burroughs prevailed—questions of patent validity and infringement—such an assessment would represent a cost out of proportion to Dick's inequitable conduct. In fact such a major assessment would itself seem inequitable. On the other side of the coin, it would obviously be inappropriate to award attorneys' fees against Burroughs. Indeed even were Burroughs not to have prevailed on the inequitable conduct issue, this case—hard-fought on both sides, with each party asserting substantial (and far more than merely colorable) arguments as to invalidity and infringement—could not fairly be viewed as "exceptional" in the statutory sense. Accordingly this Court awards no attorneys' fees to either party.

### *Infringement*

23. Although the Findings and Conclusions as to inequitable conduct are dispositive in Burroughs' favor, this Court recognizes the realistic likelihood of appeal. Accordingly the following Conclusions go on to deal with the issue of infringement (though that issue is moot if Burroughs prevails). In determining patent infringement, two inquiries are involved (*McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 671 (Fed.Cir.1984)):

(1) the scope of the claims and

(2) whether the claims, having that scope, have been infringed.

That first inquiry is a question of law, while the second is a question of fact. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983).

24. Here the claims of the Sweet Patent are drafted in a form sanctioned by 35 U.S.C. § 112, often referred to as "means plus function" or "step plus function" claims. Such claims, when unaccompanied by a recitation in the claims of structure or acts to support the means or step, are to be construed to cover the corresponding structure or acts described in the specification and equivalents thereof. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985). In that situation the literal meaning of a means-plus-function claim element is the corresponding disclosed structure or acts and their equivalents, and once the literal meaning has been established for each element of the claim, if the claim is not literally infringed, the doctrine of equivalents may be applied to the claim as a whole. *Id.*

25. Burroughs urges its character printer does not perform the step of Sweet claim element 1(g) or the functions of Sweet claim elements 4(d), 10(d), 11(e), 13(g), 24(i), 25(d), 30(d) or 33(e), when those claim elements are properly construed. Burroughs further urges its character printer does not perform the corresponding acts or use the corresponding structure of the Sweet Patent or their equivalents. But those arguments read into each of those Sweet claim elements a word that is absent from them: Burroughs effectively substitutes into the claims the phrase "*all* the instantaneous values" for "the instantaneous values" of the variable input signal. True enough, the illustrative devices depicted in the Sweet Patent show the ink drops

being charged in accordance with the instantaneous values of all the significant variations of the input signal (depicted for illustrative purposes as a sine wave), so as faithfully to record the entire waveform of that signal. But that is not a limitation inherent in the Sweet Patent claims. Accordingly the fact that the Burroughs printer includes feedback phasing charge-control circuitry that limits precisely which instantaneous values of the variable input signal are recorded does not alter the fact that the recording portion of the Burroughs printer in fact charges the drops in accordance with "the instantaneous values" (though not *all* the instantaneous values) of a varying signal.

26. Because the accused Burroughs character printer thus makes use of Sweet claim elements 1(g), 4(d), 10(d), 11(e), 13(g), 24(i), 25(d), 30(d) and 33(e) or their equivalents, there is literal infringement of those claims. That determination obviates any need to refer to the doctrine of equivalents, under which in order for an accused product to infringe a patent's claims, it must perform in its entirety "substantially the same function in substantially the same way to obtain substantially the same result" as the claimed product or process. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), quoting language ultimately traceable to *Union Paper-Bag Machine Co. v. Murphy*, 97 U.S. (7 Otto) 120, 125, 24 L.Ed. 935 (1877). Nonetheless that doctrine too would be satisfied under the circumstances here, for the accused Burroughs character endorser or printer does function to record the instantaneous values (albeit not *all* such values) of a varying signal, and for that purpose it does operate to charge drops in accordance with such instantaneous values.

27. Conclusion 26 is not affected by the Findings that the Sweet Patent is limited to oscillography. In the sense employed in the Findings, the recording portion of the Burroughs character printer (the infringing device) also functions by oscillographic recording.

28. Because the accused portion of the Burroughs character printer falls within the scope of the Sweet Patent claims asserted in this case, and because the relevant portion of the character printer is the overall equivalent of Sweet's claimed subject matter, it infringes those claims, either literally or under the doctrine of equivalents. For the reasons stated in Conclusions 9–22, that infringement is nonactionable.

\* \* \*

It is therefore ordered that plaintiff A.B. Dick Company take nothing, that this action be dismissed on the merits and that defendant Burroughs Corporation recover of A.B. Dick Company its costs of action.