**A.B. DICK COMPANY,**
Appellant/Cross-Appellee,

v.

**BURROUGHS CORPORATION,**
Appellee/Cross-Appellant.

Appeal Nos. 86–562, 86–645.

United States Court of Appeals,
Federal Circuit.

Aug. 18, 1986.

---

Dugald S. McDougall, Chicago, Ill., argued, for appellant/cross-appellee. With

opinions in accord with this Court's Rule 18(a).

him on brief was Keith V. Rockey. Edgar H. Schmiel and Peter S. Lucyshyn, A.B. Dick Co., Chicago, Ill., of counsel.

Charles W. Bradley, Davis Hoxie Faithful & Hapgood, New York City, argued, for appellee/cross-appellant. With him on brief were Steven D. Glazer, Kevin R. Peterson and Gordon K. Harris, Jr., Burroughs Corp., Detroit, Mich., of counsel.

Before RICH and BALDWIN, Circuit Judges, and MILLER, Senior Circuit Judge.

JACK R. MILLER, Senior Circuit Judge.

These are cross-appeals from decisions of the United States District Court for the Northern District of Illinois, 617 F.Supp. 1382, 228 USPQ 65 (N.D.Ill.1985).[1] In No. 86–645, Burroughs Corp. ("Burroughs") appeals the decision of the district court that A.B. Dick's ("Dick") Sweet patent claims 1, 3, 4, 10–13, 15, 16, 18, 24–26, and 30–33 are not invalid and are infringed, either literally or under the doctrine of equivalents. In No. 86–562, Dick appeals the decision of the district court that the patent claims are unenforceable due to inequitable conduct of Sweet and his patent attorneys (hereinafter collectively "Sweet") in the prosecution of his patent. We affirm the district court's decision in No. 86–562 and, therefore, need not address the parties' contentions in No. 86–645.

## BACKGROUND

### A. *Sweet's Invention*

The Sweet patent is directed to a direct writing signal recording system which writes on a record medium by projecting a stream of writing fluid in the form of a succession of uniformly spaced droplets. The droplets are charged electrostatically in accordance with instantaneous signal values [independent of one another] and then deflected electrostatically in accordance with the charges carried by the droplets.

U.S.Pat. No. 3,596,275 Abstract; *see* col. 1.

A complete description of Sweet's patented invention and other relevant facts are set forth in the opinions of the district court in this case and in another case relating to the same patent. *Mead Digital Systems, Inc. v. A.B. Dick Co.*, 521 F.Supp. 164, 213 USPQ 328 (S.D.Ohio 1981), *aff'd*, 723 F.2d 455, 221 USPQ 1035 (6th Cir. 1983).[2] Familiarity with these facts is presumed.

### B. *Pertinent Prior Art*

1. *Waage article* (1956). This reference states that a "uniform succession of water droplets could be produced," which are then deflected in an "electrostatic field in a manner analogous to deflection of electrons in a cathode ray tube." *Mead*, 521 F.Supp. at 168, 213 USPQ at 330. However, Waage did not suggest a recording use for his discovery. *Id.*

2. *Magarvey articles.* Two articles based on studies by Magarvey with Taylor (M–T) (1956) and Magarvey with Blackford (M–B) (1962) (collectively, the Magarvey articles). *Mead*, 521 F.Supp. at 168, 213 USPQ at 330–31; 617 F.Supp. at 1387, 228 USPQ at 68. The authors studied induction charging on individual water drops and describe a device and method of charging discrete water droplets produced at a vibrating nozzle, an induction ring which charged drops passing through it, an electrode for electrostatically deflecting the charged drops as a function of the charge of the drops, and a collector for receiving the charged drops. *Id.* These articles also describe the addition of blue analine dye to enhance the contrast for photography. *Mead*, 521 F.Supp. at 169, 213 USPQ at 331. They do not disclose printing or re-

---

1. The patent in suit (the Sweet patent) is U.S. Pat. No. 3,596,275 for a high-speed ink-jet recorder, issued to Richard Sweet on July 27, 1971, based on an application filed Mar. 25, 1964.

2. The district court adopted wholesale many of the findings made by the *Mead Digital Systems, Inc.* district court. Where we refer to such a finding, appropriate cross-citations are made to *"Mead."*

cording with the droplets, 617 F.Supp. at 1389, 228 USPQ at 69; *Mead*, 521 F.Supp. at 175, 213 USPQ at 336, and do not disclose selective charging of the drops projected toward a recording medium.[3] *Id.*

3. *Winston patent* (No. 3,060,429, issued Oct. 1962). The reference discloses a recorder in which the ink drops were charged uniformly and shot through a deflecting field of varying electrical magnitudes. Winston "employed an attractive electrostatic force ... to draw the ink droplets from the nozzle." *Mead*, 521 F.Supp. at 169, 213 USPQ at 331; 617 F.Supp. at 1387, 228 USPQ at 68. In this recorder, the speed of recording is limited by the rate at which the droplets move through the deflection field which is slower than Sweet's rate limitation. 617 F.Supp. at 1389, 228 USPQ at 69.

4. *Hendricks.* An article cited by the Sweet patent examiner in 1970, not otherwise relevant.

5. *Jacob.* A patent cited by the Sweet patent examiner in 1970, not otherwise relevant.

### C. *Sweet Prosecution*

Funded by an Army Signal Corps contract in the early 1960's, Sweet developed a technique for selective charging and deflection of individual ink droplets for an oscillograph, 617 F.Supp. at 1384–85, 228 USPQ at 66, which technique he used to create a high-speed ink-jet recorder. *Id.*

Sweet entered into a license with Minneapolis-Honeywell, which, in accordance with the agreement, prosecuted Sweet's patent application.[4] Lockwood Burton was Honeywell's in-house counsel prosecuting the Sweet application. 617 F.Supp. at 1385, 228 USPQ at 66. In a letter to Burton, dated May 16, 1963, Sweet characterized his invention, thus: "[i]t seems to me that the most important part of the system

is that portion that forms, charges, and projects the ink droplets." 617 F.Supp. at 1392, 228 USPQ at 71.

Sweet's application was filed on July 31, 1963, SN 298,996. 617 F.Supp. at 1387, 228 USPQ at 67. The application did not include citations to the Magarvey articles, the Waage article, or the Winston patent. *See* 617 F.Supp. at 1392, 228 USPQ at 71.

At least by late 1963 or early 1964, Sweet knew of the Magarvey articles. *Id.* In March, 1964, Sweet published a report entitled "High Frequency Oscillography with Electrostatically Deflected Ink Jets," listing as references the Magarvey articles and the Waage article. *Id.; see Mead*, 521 F.Supp. at 172, 213 USPQ at 334.

Before the PTO acted on the application, Honeywell filed a continuation-in-part (CIP) application on March 25, 1964, No. 354,659, which eventually matured into the Sweet patent. 617 F.Supp. at 1387, 228 USPQ at 67. This application also did not include a citation to the above references. 617 F.Supp. at 1392, 228 USPQ at 71.

In September, 1964, Sweet submitted to Review of Scientific Instruments an article in which he stated that, "[r]ecently, Magarvey and Blackford ... have reported on techniques for forming, charging, and deflecting water drops, using methods similar to those described here." 617 F.Supp. at 1392, 228 USPQ at 71.

In late 1965, the firm of Flehr and Swain assumed responsibility for prosecution of Sweet's application.

On April 4, 1967, the patent examiner rejected numerous claims under 35 U.S.C. §§ 102 and 103, but did not cite the Magarvey articles or Waage article. In response, on June 28, Sweet amended several of the claims and traversed the examiner's rejections on several of the others. Also on June 28, Sweet copied claims 32–42 from a patent, Lewis *et al.* (and later copied claims

---

**3.** Another Magarvey reference, an article published in 1957, was found to be important by the district court, 617 F.Supp. at 1387, 228 USPQ at 68, although not on the issue of inequitable conduct.

**4.** In May, 1966, Dick entered into an exclusive license with Sweet, subject to outstanding licenses. 617 F.Supp. at 1387, 228 USPQ at 68. In 1972, Dick purchased all of the patent rights. *Id.*

43–48), and filed a Request for Declaration of Interference. In October of 1967, the examiner wrote attorney Flehr that "claims 1–31 are allowed."

An interference was declared (No. 96,-185), at which time the prosecution of the CIP application was suspended. During the interference proceedings, Flehr submitted numerous documents, including the 1964 Sweet report and subsequent Sweet article that cited the Magarvey articles, to support Sweet's right to make the counts. 617 F.Supp. at 1392, 228 USPQ at 71–72. In early 1970, the Board of Patent Interferences terminated the interference, holding that Sweet's specification did not support the counts. *Id.*

In April of 1970, Sweet and Flehr corresponded on the claims remaining in the application. 617 F.Supp. at 1392, 228 USPQ at 71. At that time, Sweet brought Waage to the attention of Flehr, stating that it was "the closest prior art that I am aware of." *Id.*

Sweet amended his application in June of 1970. Claim 19 was amended to distinguish from Waage, but Flehr did not cite Waage to the examiner. *Id.* At the same time, Sweet cancelled the copied claims, substituted claims 49 and 50 for 14 and 15, and added new claims 51–53. The examiner issued an office action in July of 1970, rejecting claims 1–4, 6–9, 16, 17, 19, 25, 30, 31, and new claims 49, 51, and 52 as anticipated by or rendered obvious from M–B, M–T, and Hendricks, and rejected claims 50 and 53 for obviousness from the M–B reference in view of Jacob. *See* 617 F.Supp. at 1392, 228 USPQ at 72. The examiner stated that fourteen claims (claims 1–4, 6–9, 16, 17, 19, 25, 30, and 31), "which were previously allowed are now rejected." [5]

On October 5, 1970, Sweet cancelled rejected claim 16 (the broadest claim), substituted a new claim for claim 19, and amended the remaining claims, arguing, *inter alia,* that the publications cited did not anticipate or render obvious certain features of Sweet's invention. In traversing

the examiner's rejections, Flehr referred to the Hendricks article as follows: "The Hendricks publication in Journal of Colloid Science discloses apparatus for forming a jet spray which is somewhat similar to what is disclosed in Winston ... previously cited by the Examiner." *See* 617 F.Supp. at 1393, 228 USPQ at 72. Flehr continued: "Appellant's invention does not employ a spray-type jet. On the contrary, appellant's invention produces uniformly sized and regularly spaced droplets which move in a single file. ..." *See id.*

On October 9, 1970, the examiner and Flehr held a telephone conference in which an amendment to a claim was discussed, and Flehr then filed a supplemental amendment. The Notice of Allowance issued January 18, 1971, and the Sweet patent issued July 27, 1971, with 33 claims.

### D. *District Court Proceedings*

On the issue of inequitable conduct, the district court was primarily concerned with Sweet's failure to bring to the attention of the examiner the Magarvey articles. The court reviewed the evidence establishing the dates of Sweet's knowledge of the Magarvey articles, the evidence (both his correspondence and his own articles) of his own opinion of their importance, his failure to draw the Magarvey articles to the attention of the examiner, his actions on his claims made in response to the examiner's office actions after the examiner discovered the Magarvey articles, and, as circumstantial evidence, his actions and statements to the examiner with respect to other references.

The court interpreted Sweet's 1964 statement that the M–B article described "methods similar to those described here" as characterizing that reference as highly relevant to his own work on ink-jet recorders. 617 F.Supp. at 1392, 228 USPQ at 71. The court found that the Magarvey articles "disclosed material matters bearing on that 'most important part' of Sweet's claimed invention." 617 F.Supp. at 1392, 228 USPQ

---

5. Claims 51–53, rejected on M–B or M–B with Jacob, were initially proposed in 1970, when prosecution was resumed after the interference

was dissolved. Those claims are not relevant to the discussion of inequitable conduct in this case.

at 71. The failure of Sweet or Burton to disclose the Magarvey articles (of which Sweet had been aware since early 1964) in the CIP application and Sweet's or Flehr's failure to cite those articles when prosecution resumed after the interference was dissolved was considered by the court to be "no question" but inequitable conduct. 617 F.Supp. at 1391, 228 USPQ at 71. The court concluded that Sweet's conduct evidenced "specific intent ... not to disclose that material information to the PTO in conjunction with the request for allowance of all claims...." 617 F.Supp. at 1393, 228 USPQ at 72.

The court declined to base its holding of inequitable conduct solely on Sweet's withholding of the Waage article or on the Winston patent (or combination), although so argued by Burroughs. However, the court interpreted Sweet's conduct with respect to those references as evidence going to the issue.

The court found that the failure to cite Waage did not rise to a high level of materiality because the *Mead* court had determined that Waage was either more remote or cumulative to the prior art known by the examiner. Despite the lack of significant materiality, the district court found opprobrious Flehr's failure to cite Waage in light of Sweet's reference to the article in a letter to him as "the closest prior art that I am aware of." 617 F.Supp. at 1392, 228 USPQ at 72.

Regarding the Winston patent, the district court explained that evidence of intent to deceive or mislead the examiner was clear from the amendment filed in response to the examiner's July of 1970 rejection of claims. The district court stated that

> [i]n the context of Sweet's response that was an affirmatively misleading representation, for *Winston* disclosed a single file of uniform drops—and the clearly intended implication of the response was that Sweet's use of a single file of drops distinguished it from the prior art because the prior art had not disclosed such a use. Nothing in the response, with its offhand earlier reference to Winston,[5]

pointed the Examiner toward a fresh look at Winston which would have disclosed the misleading character of the distinction asserted by Sweet.

---

[5] It is not dead certain whether the locution employed in the response was disingenuous or only careless (if the latter, note the authorities' use of "gross negligence" as satisfying the intent requirement of inequitable conduct). Hendricks may indeed have disclosed an *apparatus* "somewhat similar" to that of Winston. But in the phrase quoted in the first sentence of this Finding 43(b), the immediate antecedent of "which is somewhat similar" was "jet spray" and not "apparatus"—and the essence of the patent application practice is the precise use of language. Winston did *not* disclose a jet spray, and the single file of droplets it *did* disclose (as Sweet's work did later) was the specific focus of the lawyer's and Sweet's substantive argument—advanced by them in their successful effort to distinguish Sweet's work from the prior art.

617 F.Supp. at 1393, 228 USPQ at 72 (emphasis in original).

## ANALYSIS

The precise issue is whether nondisclosure by an applicant during prosecution can be considered inequitable conduct sufficient to render the issued patent unenforceable where the nondisclosure was of known prior art references on which the examiner (after independently discovering the references) rejected claims previously allowed, most of which were then allowed after amendment.

Much has been written in this court about the duty of candor patent applicants and their counsel are required to maintain in their relationship with the PTO, the violation of which constitutes inequitable conduct resulting in unenforceability of a patent. *Driscoll v. Cebalo*, 731 F.2d 878, 884, 221 USPQ 745, 750 (Fed.Cir.1984). The district court here held that Burroughs had shown inequitable conduct by clear and convincing evidence of intent and materiality; and, unless its findings on intent and materiality are clearly erroneous, affirmance is indicated. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984).

## A. *Materiality*

One of the standards identified by this court as appropriate to determine materiality is Rule 56(a), 37 C.F.R. § 1.56(a). *See In re Jerabek,* 789 F.2d 886, 890, 229 USPQ 530, 533 (Fed.Cir.1986); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1362–63, 220 USPQ 763, 773 (Fed. Cir.), *cert. denied,* ── U.S. ──, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). This rule states the duty of those who practice before the PTO to "disclose to the Office information they are aware of which is material to the examination of the application." Known information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a). We are satisfied that the information not disclosed by Sweet and his patent attorney was material for purposes of Rule 56(a).

Dick argues that the Magarvey articles were immaterial because Sweet considered them irrelevant. The relevance of the Magarvey articles to Sweet's invention might once have been disputed. They did not disclose a recording function for the method and device which is an object of Sweet's invention. However, they describe induction charging of individual water drops (sometimes with blue dye added) produced at a vibrating nozzle and an electrode for electrostatically deflecting the charged drops as a function of the charge of the drops. As Sweet himself stated in 1963 to Burton, "the most important part of the system is that portion that forms, charges, and projects the ink droplets."

Despite the possibility of good faith dispute on the aptness of the Magarvey articles as references, Sweet indisputably knew of the Magarvey articles throughout most, if not all, of the prosecution of his CIP application. He stated in 1964 that the M–B article described "methods similar to those described" by himself at that time. Moreover, the Magarvey articles describe a device and methodology very like "the most important part of the system." The examiner confirmed the materiality of the Magarvey articles when, in 1970, he rejected fourteen claims allowed in 1967 before he independently discovered the Magarvey articles.

Dick also asserts that the Magarvey articles did not render unpatentable the claims earlier allowed but later rejected and that the previously allowed claims "were patentable over Magarvey all along." However, the test for materiality is *not* whether there is anticipation or obviousness but, rather, what a "reasonable examiner would consider ... important in deciding whether to allow the application to issue as a patent."

Dick invokes *Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 223 USPQ 603 (Fed.Cir.1984), which it argues is "an apt precedent for reversal in this case because it dealt ... with a lower court which had declared uncited references highly material without bothering to compare their disclosures with what was being claimed." Although *Kimberly-Clark Corp.,* 745 F.2d at 1457, 223 USPQ at 616, and *J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1562–63, 223 USPQ 1089, 1094–95 (Fed.Cir.1984), *cert. denied,* ── U.S. ──, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985), indicate that a court will look to the reasonableness of a rejection in light of the references, such analysis is unnecessary and inappropriate where, as here, the applicant has stated that he considers the references relevant and important and where an examiner (not demonstrated by Sweet to have been unreasonable) has considered the references "important" enough to be used as a basis for rejections of previously allowed claims.

*Kimberly-Clark Corp.* bears no resemblance to this case except for the superficial similarity of the issue of the effect of nondisclosure on the court's determination of inequitable conduct. Notably dissimilar is the effect of nondisclosure on the claims in the application. In *Kimberly-Clark Corp.,* the nondisclosure of prior art was "material only to abandoned claims long since cancelled during prosecution after being rejected by the examiner as unpatent-

**1398**

able for reasons not involving the uncited prior art." 745 F.2d at 1457, 223 USPQ at 616–17. In this case, Sweet's 1970 cancellation of claims 16 and 19 and the amendments to claims 1–4, 6–9, 17, 25, 30, and 31 (albeit these were later allowed) *directly* involved the uncited Magarvey articles. This is precisely the "reality" of which Judge Rich wrote in *Kimberly-Clark Corp.*, 745 F.2d at 1457, 223 USPQ at 617. Equally inapplicable is *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383–84, 217 USPQ 1281, 1286–87 (Fed.Cir.1983). In that case, this court affirmed the district court's decisions that the alleged infringer had not demonstrated "fraud" clearly and convincingly and that the nondisclosed prior art was not material.

Although not directly on point, *Driscoll v. Cebalo, supra,* is more nearly analogous. Dick attempts to distinguish *Driscoll* on the basis that, in that case, the uncited prior art would have rendered the claims invalid; whereas, here many claims rejected on the withheld Magarvey articles were later allowed after amendment. Such a (hypothetically final) rejection is merely a difference in degree from a rejection of claims subsequently allowed after amendment. Both rejections similarly reflect an examiner's belief that a reference is material under Rule 56(a). In this case, as evidenced by the examiner's actions after discovery of the Magarvey articles, it is beyond peradventure that the examiner would have considered them important. Sweet *cancelled* two claims in response. That the claims may be patentable over the withheld prior art, as argued by Dick, is not relevant. What is relevant is that, as the district court found, a reasonable examiner considered such prior art material under Rule 56(a) in deciding whether to allow the application. *See Driscoll,* 731 F.2d at 884, 221 USPQ at 750.[6]

We are unpersuaded by Dick's argument that the 1970 claim amendments by Flehr

were, as Flehr stated in his response at the time, to "more clearly bring out the novel features of applicant's invention." Language such as this is gratuitous and virtually meaningless, as an amendment for any other reason would lack purpose. Accordingly, we reject Dick's assertion that the district court "had neither factual nor legal basis for its conclusion that the Magarvey prior art was highly material to those claims."

**B. *Intent***

A degree of materiality may be offset by a showing of subjective good faith on the part of the applicant. However, a determination of inequitable conduct will not be avoided if knowledge of materiality or gross negligence greatly outweighs the lack of deceptive intent. *Argus Chemical Corp. v. Fibre Glass-Evercoat Co.*, 759 F.2d 10, 14–15, 225 USPQ 1100, 1103 (Fed. Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985). Where an applicant or his attorney knew or should have known that a reference was material (*see* Rule 56(a)), the failure to disclose the reference is sufficient to establish intent. *Id.; J.P. Stevens & Co.*, 747 F.2d at 1560, 1564, 223 USPQ at 1092, 1096; *Driscoll,* 731 F.2d at 885, 221 USPQ at 751.

In this case, there is unrebutted evidence of record that the Sweet application would have issued in 1967 but for the intervening interference, after which the examiner rejected fourteen of the claims previously allowed on the basis of the Magarvey articles. During the interference, Sweet, through Flehr, submitted as exhibits and relied upon the 1964 Sweet report and 1965 Sweet article that cited the Magarvey articles to support his case. We are not persuaded that from this submission, which implied a relationship between the Magarvey articles and the Sweet application, the district court drew an unsupported inference that Sweet and Flehr knew or should have known that the articles were material.

---

**6.** No evidence of record indicates that the examiner during prosecution was involved in the interference. However, the findings of the district court clearly suggest the contrary. The point was not contested by the parties on appeal.

Dick argues that "the record shows that Sweet considered the Magarvey papers irrelevant to his invention, and nothing in the record suggests that Flehr felt otherwise." To support this statement, Dick points to the three federal court opinions, cited above (Sixth Circuit, S.D.Ohio, and N.D.Illinois), in which the Sweet patent had been held not invalid over the prior art. We disagree with the arguments. Sweet's own prior statements flatly contradict the first portion of the statement. With respect to Flehr's "feelings," the three court opinions are based on different records, and the issue Dick points to them as having decided, validity, cannot serve as a defense to inequitable conduct. We note that Flehr obtained Sweet's report and article, which underscore the significance of the Magarvey articles, and proffered them during the interference. Dick's assertion that "[n]ot a scintilla of evidence in this record suggests that Messrs. Sweet and Flehr had any conscious intent to do wrong" fails under the rule of *Argus Chemical Corp.*, stated *supra*.

Dick further argues that citing Waage and the Magarvey articles in Sweet's own 1964 Report and 1965 article (both brought to the attention of the Board of Interferences) "rebuts the notion that Sweet concealed any prior art." However, we know of no support for the proposition that distribution "to the technical libraries of this country more than two years before the Patent Office first acted" on the Sweet application "negates the existence of *mens rea*." If Sweet's citation of the articles supports any inference, it is the inference of the district court to the effect that Sweet understood their importance to his invention.[7]

The district court relied on Sweet's conduct (*i.e.*, Flehr's failure to bring to the attention of the examiner the Waage article[8]) and his mischaracterization of the Winston patent to support its finding of intent underlying the holding of inequitable conduct. However, because we are satisfied that the finding of intent is otherwise well supported, we need not rely on these examples of Sweet's conduct.

Unlike the circumstances in *Kimberly-Clark Corp.*, in which the "essential elements of materiality of [the references] and the intent of the patent solicitor are both exceedingly weak," 745 F.2d at 1456, 223 USPQ at 615–16, in this case there is overwhelming evidence supporting the district court's findings on each of the "essential elements."

### C. Unfavorable Inferences from Failure to Testify

Twice in its opinion, the district court observed that neither Sweet nor his prosecution attorneys had testified at the trial, although Sweet was contractually committed to Dick (his assignee) to do so. 617 F.Supp. at 1393, 228 USPQ at 73, and 617 F.Supp. at 1396 n. 6, 228 USPQ at 75 n. 6. Dick also listed Sweet as a trial witness. 617 F.Supp. at 1396 n. 6, 228 USPQ at 75 n.

---

7. Also, the district court pointed out that "the PTO cannot realistically be thought of as the equivalent (say) of a small law office, in which notice to one person may fairly be deemed notice to all. It is not necessarily true that the PTO Examining Division will have access to proofs filed in the course of an interference." 617 F.Supp. at 1397, 228 USPQ at 74.

8. Directly on point is *In re Clark*, 522 F.2d 623, 627, 187 USPQ 209, 212–13 (CCPA 1975), in which this court's predecessor stated:

> While appellant may have believed that Stow et al. was not a relevant reference, the Patent and Trademark Office now has ample evidence from which to conclude that Stow et al. was *known* by Beckman to be highly relevant prior art. The duty to disclose relevant, material prior art under these circumstances, known to the applicant or his agents and not found by the examiner, is well established.... If appellant considered his claims sufficiently narrow to be clear of the close Stow et al. reference, the examiner, and not he or "others skilled in this art," was the person to decide whether appellant's original claims had been amended sufficiently to be patentable over Stow et al. We do not agree that appellant could, under the state of the law in 1956 or now, amend claims *expressly* to avoid a ... reference unknown to the examiner and justifiably consider there was no duty to bring that reference to the examiner's attention.

6. The court also stated that "[i]f it were necessary (and it is not under the circumstances), that would provide added inferential evidence of the element of intent." *Id.* Dick argues that inferences thereby drawn by the judge were erroneous. However, the court explicitly stated that it was not necessary to, and that it did not, draw inferences from the failure of Sweet, Burton, and Flehr to testify.[9] Although Flehr was not subject to a subpoena to testify in Illinois, Dick does not assert that it requested Flehr to testify at trial or at a deposition.[10]

In view of the foregoing, we are satisfied that the district court's holding of inequitable conduct by Sweet before the PTO is supported by clear and convincing evidence.

Accordingly, the decision of the district court in No. 86-562 that the Sweet patent claims are unenforceable is *affirmed.* The appeal in No. 86-645 is moot.[11]

AFFIRMED.

9. Even had the court drawn such inferences, it was not reversible error. When a party knows of witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder may draw the inference that the testimony would have been unfavorable. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 719 F.2d 1335, 1353 (7th Cir.1983). Generally, the opposing party must establish that the missing witness was peculiarly within the adversary's power to produce by showing that the witnesses were unavailable to be called. *Id.* An unfavorable inference may not be drawn from the lack of testimony by one who is equally available to be called by either party. *Johnson v. Richardson,* 701 F.2d 753, 757 (8th Cir.1983). This generalization is not applicable, however, where the likelihood of bias of the potential witnesses is great, and in such a case the witnesses are not considered "equally available" to both parties. For instance, employees are usually not considered to be "equally available." *Chicago College,* 719 F.2d at 1353. Because his assignment of patent rights to Dick created a likelihood of bias in Dick's favor, Sweet cannot be considered "equally available" to both Dick and Burroughs. Due to his contractual obligation to Dick to testify, Sweet's position is similar to that of an employee, whose relationship with Dick would be such that if he "could give important testimony relative to issues in litigation ... and his

absence is unaccounted for, ... the presumption arises that [his] testimony ... would be unfavorable to his employer." 719 F.2d at 1353. *People v. Belcher,* 133 N.E.2d 538, 544, 9 Ill. App.2d 570 (1956). In this case, Burroughs placed in issue and presented a *prima facie* case demonstrating inequitable conduct by Sweet and Flehr. Under the circumstances, it would have been expected that Dick would call Sweet to testify. Flehr did not have a similar relationship with Dick. However, Dick would naturally have been expected to call Flehr if his testimony on the reasonableness of his conduct would have been favorable to it, or to explain why it did not do so.

10. Burton, although not a witness at trial, was deposed during discovery.

11. Although the court found that Sweet's conduct before the PTO rendered this case exceptional, "given the enormous amount of time spent in this litigation on substantive issues on which Dick and not Burroughs prevailed," 617 F.Supp. at 1398, 228 USPQ at 76, it said that an assessment of costs and attorney fees against Dick "would represent a cost out of proportion to Dick's inequitable conduct.... On the other side of the coin, it would obviously be inappropriate to award attorneys' fees against Burroughs." *Id.* Burroughs has not persuaded us that this was an abuse of discretion.