31 F.3d 1177
 32 U.S.P.Q.2d 1496
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
SGS-THOMSON MICROELECTRONICS, INC., Plaintiff-Appellant,
v.
INTERNATIONAL RECTIFIER CORPORATION, Defendant-Cross-Appellant.
 Nos. 93-1386, 93-1409.
 United States Court of Appeals, Federal Circuit.
 July 14, 1994.
 
 Before MICHEL, PLAGER and RADER, Circuit Judges.
 MICHEL, Circuit Judge.
 
 DECISION
 
 1
 This appeal presents for review three rulings entered in a patent infringement suit filed by SGS-Thomson Microelectronics, Inc. (SGS) against International Rectifier Corporation (IR). First, the United States District Court for the Northern District of Texas in SGS-Thomson Microelectronics, Inc. v. International Rectifier Corp., No. 4-91-408-A, slip op. at 7 (N.D.Tex. Nov. 12, 1991), transferred this action to the Central District of California under 28 U.S.C. Sec. 1406(a) because the court found that IR was not subject to personal jurisdiction in the Northern District of Texas and therefore venue did not properly lie there. Second, the United States District Court for the Central District of California in SGS-Thomson Microelectronics, Inc. v. International Rectifier Corp., No. CV-92-2202-R, slip op. at 2 (C.D.Cal. Mar. 4, 1993), entered summary judgment in favor of IR, dismissing for lack of standing SGS's claims for infringement of two patents assigned to SGS by affiliated companies on the ground that the assignments were shams. The two patents involved are United States Patent No. 4,495,513 (the '513 patent) and United States Patent No. 4,712,127 (the '127 patent). Third, in the same action, slip op. at 2 (C.D.Cal. May 5, 1993), the district court entered summary judgment in favor of IR on SGS's claim for infringement of a third patent, United States Patent No. 4,553,314 (the '314 patent), on the ground that the patent had been procured through inequitable conduct.
 
 
 2
 SGS appeals the rulings of both district courts. In addition, IR cross-appeals the California district court's denial of summary judgment that the '314 patent is anticipated by or rendered obvious in view of certain prior art.
 
 
 3
 For the reasons discussed below, we (1) reverse the Texas district court's decision to transfer this case to the Central District of California and remand this action to the Central District of California for further proceedings; (2) vacate the California district court's entry of summary judgment dismissing for lack of standing SGS's claims for infringement of the '513 and '127 patents; (3) vacate the California district court's entry of summary judgment in favor of IR on SGS's claim for infringement of the '314 patent because of inequitable conduct; and (4) affirm the denial of summary judgment that the '314 patent is invalid. We also reprimand the parties for citing as precedent a nonprecedential case in violation of Federal Circuit Rule 47.6(b).
 
 DISCUSSION
 
 4
 I. Personal Jurisdiction and Venue.
 
 
 5
 A district court's determination regarding personal jurisdiction is a question of law, reviewable de novo where, as here, the facts are not disputed. Bullion v. Gillespie, 895 F.2d 213, 216 (5th Cir.1990). A nonresident defendant is amenable to personal jurisdiction in a federal district court if (1) the defendant is within the reach of the forum state's long-arm statute, and (2) due process is satisfied. Id. at 215. Because the Texas long-arm statute extends to the limits of due process, id., the sole inquiry here is whether due process requirements are met. Under the federal due process standard, IR is subject to personal jurisdiction so long as it has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). More specifically, IR was subject to personal jurisdiction in Texas so long as (1) it had "minimum contacts" with Texas, and (2) requiring it to defend in Texas was not unfair or unreasonable. See Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A., 898 F.2d 1071, 1073 (5th Cir.), cert. denied, 498 U.S. 900 (1990).
 
 
 6
 SGS contends that the district court erred as a matter of law in considering only the place where IR allegedly used SGS's patented process (California), rather than where IR sold the allegedly infringing products (Texas). Section 271(a) of title 35 of the United States Code makes clear clear that each sale of a product made using a patented process is an act of infringement.
 
 
 7
 Had the district court, as required by section 271(g), considered where IR sold the allegedly infringing products, SGS argues that the district court would have found ample evidence of sufficient contacts between IR and Texas. After all, IR actively solicited sales in Texas (including in the Northern District), set up sales and distribution networks designed to serve the forum, and sold products made by the allegedly infringing process to customers in the forum.[1] IR had nine authorized distributors in Texas, including four in the Northern District, an exclusive sales representative with its principal office in the Northern District, admitted annual sales in the District on the order of $1,000,000, and employees who made monthly visits to Texas to call on customers and assist with distributor training.
 
 
 8
 Contrary to SGS's allegation, the fact that IR had no offices or other physical facilities in Texas does not overcome the contacts described above. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985); see also International Shoe Co., 326 U.S. at 313, 320 (company with no physical presence in Washington, which sold products there through agents, is subject to jurisdiction).
 
 
 9
 Nor does the fact that IR uses "independent" distributors and sales representatives, retains the right to approve sales at its offices, and ships products so that title passes upon delivery to a carrier change the result. See Oswalt v. Scripto, 616 F.2d 191, 197 n. 8 (5th Cir.1980) ("[J]urisdiction does not depend on the technicalities of when title passes. A manufacturer can be subjected to in personam jurisdiction as a result of a distribution system employing wholly independent wholesalers as well as one employing its own corporate apparatus."); see also International Shoe, 326 U.S. at 314 (fact that company retained right to approve all sales at office in St. Louis, and shipped products f.o.b. from points outside Washington, did not remove jurisdiction from Washington courts). Similarly, the fact that IR's sales in the Northern District of Texas were less than 1% of its total sales for fiscal year 1991 is immaterial. Vault Corp. v. Quaid Software, Ltd., 775 F.2d 638, 640, 228 USPQ 139, 141 (5th Cir.1985) (510 sales in forum, totaling $2,968, representing 0.3% of defendant's total sales of product were sufficient to establish that its relationship with forum was not "random," "fortuitous" or "attenuated"). The evidence establishes that IR has purposefully directed activities at Texas with the intent of benefitting from the sale of products that SGS alleges were made in violation of the '314 patent. In short, IR's actions are sufficient to subject it to personal jurisdiction in the Northern District of Texas. See Burger King, 471 U.S. at 472-76.
 
 
 10
 Alternatively, IR's contacts with Texas were sufficient to subject it to specific personal jurisdiction under the stream of commerce doctrine. When a manufacturer such as IR "delivers its products into the stream of commerce with the expectation that they will be" sold in the forum state, the minimum contacts test is satisfied, provided that " 'the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there.' " Irving v. Owens-Corning Fiberglass Corp., 864 F.2d 383, 385 (5th Cir.), cert. denied, 493 U.S. 823 (1989) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980)).
 
 
 11
 In the present case, IR's conduct and connections with Texas fit this description. IR sells its products throughout the United States, conducts a national advertising campaign, and solicits customer inquiries and sales through a national toll-free telephone number. IR products, including substantial quantities of the accused products, are shipped to Texas, where they are sold to Texas customers. In short, IR entered its products into an unrestricted stream of commerce, expecting its products to be distributed throughout Texas. In so doing, IR " 'purposefully availed' itself of the privilege of doing business" in Texas and should reasonably have anticipated having to defend a lawsuit there arising from its sales of accused products. World-Wide Volkswagen, 444 U.S. at 297.
 
 
 12
 IR responds that the Supreme Court did not intend to extend the application of the stream of commerce doctrine beyond cases of tort liability for defective products, and that the stream of commerce doctrine has "scant application" in patent infringement cases. Contrary to IR's contention, this doctrine has been applied as readily to intellectual property cases as to other cases. For example, in Novacolor, Inc. v. American Film Technologies, Inc., 1992 WL 170564 (N.D.Ill.1992), the court held that specific personal jurisdiction existed over an out-of-state manufacturer who sold through an in-state distributor products which allegedly infringed the plaintiff's process patent. See also Beverly Hills Fan Co. v. Royal Sovereign Corp., 30 USPQ2d 1001 (Fed.Cir.1994) (patent case in which the court applied the stream of commerce doctrine to subject defendant to personal jurisdiction; defendant's only contact with forum state occurred through shipping accused fan into the forum state via established distribution channels).
 
 
 13
 Because IR was subject to personal jurisdiction in the Northern District of Texas, venue was proper in that district. Under 28 U.S.C. Sec. 1400(b), venue in a patent case is proper where the defendant "resides." Under 28 U.S.C. Sec. 139(c), a corporate defendant resides where it is subject to personal jurisdiction. VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1578, 1584, 16 USPQ2d 1614, 1617, 1621 (Fed.Cir.1990), cert. denied, 111 S.Ct. 1315 (1991). Accordingly, the District Court for the Northern District of Texas erred in transferring the case to the Central District of California. Because we find the error harmless, and because judicial economy would be served by transferring the case back to a court already familiar with the patents and technology at issue in this case, we reverse and remand to the Central District of California for further proceedings with respect to the infringement claims.
 
 
 14
 IR further argues that, even if IR is subject to personal jurisdiction in Texas, this court has no jurisdiction over the appeal because IR's post-judgment motion for attorney fees under 35 U.S.C. Sec. 285 constitutes a Rule 59(e) motion to alter or amend the final judgment which is at issue in this appeal. Federal Rule of Appellate Procedure (FRAP) 4(a)(4) provides that a "notice of appeal filed after ... entry of judgment but before the disposition of [a Rule 59 motion to alter or amend the judgment] is ineffective...." In the present case, IR filed its motion for attorney fees, which according to IR's argument now constitutes a Rule 59(e) motion to alter or amend the final judgment, after entry of final judgment but before the district court ruled on the motion for attorney fees.[2] In fact, as of the date SGS filed its brief, the district court still had not ruled on SGS's motion for attorney fees. As such, IR contends that SGS's first notice of appeal is ineffective pursuant to FRAP 4(a)(4), and this court lacks jurisdiction over this appeal.
 
 
 15
 The Supreme Court, however, has made it clear that a decision on a motion for attorney fees is not a Rule 59(e) motion. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 200 (1988) ( citing White v. New Hampshire Dep't of Employment Security, 455 U.S. 445, 451 (1982)) ("a request for attorney's fees under 42 U.S.C. Sec. 1988 is not a motion 'to alter or amend the judgment' within the meaning of Federal Rule of Civil Procedure 59(e)"). Although IR cites Hairline Creations, Inc. v. Kefalas, 664 F.2d 652, 659 (7th Cir.1981), for the proposition that an attorney fee motion seeking an "exceptional case" determination requires the trial court to reexamine the basis of the judgment and thus "leads inescapably to the conclusion that a post-judgment motion for attorney's fees is a motion to alter or amend the judgment," Hairline was decided by the Seventh Circuit before Budinich and White and hence has little precedential value. In any event, it is not binding precedent here, for Ninth Circuit procedure controls.
 
 
 16
 Moreover, the Supreme Court has explicitly held "that a decision on the merits is a final decision for purposes of immediate appeal, even though the recoverability or amount of attorney's fees [under 35 U.S.C. Sec. 285] remains to be determined." Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 761 n. 3, 9 USPQ2d 1417, 1420-21 n. 3 (Fed.Cir.1988), cert. denied, 493 U.S. 814 (1989) ( citing Budinich, 486 U.S. at 200). See also Budinich, 486 U.S. at 202-03 (a decision on the merits is a final and appealable decision "whether or not there remains for adjudication a request for attorney's fees...."). The fact that a party may incorrectly call its attorney fee motion a motion to alter or amend under Rule 59(e) does not affect an appellate court's jurisdiction over a previously filed appeal from the final judgment on the merits. See Campbell v. Bowlin, 724 F.2d 484, 487-88 (5th Cir.1984) (per curiam ) (even where post-judgment motion for attorney fees is improperly characterized as Rule 59(e) motion, previously filed notice of appeal remains operative). Thus, this court has jurisdiction to consider the appeal before us.
 
 
 17
 II. Assignment.
 
 
 18
 After the case was transferred to the Central District of California, SGS filed an amended complaint, which contained three claims: the original claim for infringement of the '314 patent, and claims for infringement of the '513 and 127 patents. The '513 and '127 patents had been assigned to SGS by two sister companies, SGS-Thomson Microelectronics, S.A. (SGS-France) and SGS-Thomson Microelectronics, S.r.l. (SGS-Italy). IR moved for summary judgment with respect to the '513 and '127 patents, asserting that SGS lacked standing to enforce those patents on the ground that the assignments were sham. The district court granted IR's motion, and SGS now appeals.
 
 
 19
 To have standing to sue for infringement, a plaintiff must possess all substantial rights to the patent. Bell Intercontinental Corp. v. United States, 381 F.2d 1004, 1011 (Ct.Cl.1967). IR does not dispute and the documents plainly provide that SGS-France assigned "its entire right, title and interest" in the '513 patent to SGS, and that SGS-Italy similarly assigned "its entire right, title and interest" in the '127 patent to SGS. IR also concedes that the assignments were properly executed and recorded with the PTO. Nevertheless, IR asserts that the assignments should be disregarded because "surrounding circumstances" demonstrate that they are "shams." See appellant's brief at 41. IR, however, has not produced any evidence that SGS did not receive the rights expressly conveyed.
 
 
 20
 Nor do the "surrounding circumstances" to which IR points support a finding of a sham assignment. First, IR's assertion that no consideration was given for the assignments is misplaced. Both assignments recite consideration given and received. See Appendix at 2902 and 2905. The '127 assignment specifically identified a cash payment of $10,000 as consideration, and it is undisputed that SGS made the full payment. Mr. Robinson testified that the consideration for both assignments (the '127 and the '513) also included SGS's agreement to continue to pay royalties to SGS-France and SGS-Italy pursuant to a pre-existing arrangement. See Appendix at 8496 and 8499-8500.
 
 
 21
 Although IR attempts to argue that the $10,000 cash payment was "nominal" or motivated by Italian legal requirements, it is well-established that "the law will not inquire into the adequacy of consideration so long as the consideration is otherwise valid to support a promise." 3 Williston on Contracts Sec. 7:21, at 383 (4th ed. 1992). In the present case, the $10,000 cash payment, as well as the agreement to continue royalty payments to SGS-France and SGS-Italy, appears "otherwise valid."
 
 
 22
 Moreover, the district court's failure to acknowledge the agreements to continue royalty payments following an assignment was improper. The Federal Circuit in Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875, 20 USPQ2d 1045, 1049 (Fed.Cir.1991), quoting Rude v. Westcott, 130 U.S. 152, 162-63 (1889), noted with approval that the "retention of [a] portion of 'sales, royalties, or settlements, or other sources' does not limit the assignment of [the] patent," so long as the retention of royalty rights was not a reservation of a substantial right, such as "the right to exclude others from making, using or selling under the patent grant." In this case, as noted above, SGS-France and SGS-Italy assigned their "entire right, title and interest" in the patents to SGS, including their right to exclude others from making, using and selling their patented invention.
 
 
 23
 Nor does SGS's agreement to share infringement damages with SGS-Italy and SGS-France indicate that SGS did not receive all substantial rights to the '127 and '513 patents. Both this court and the Supreme Court have specifically held that an assignee's retention of an interest in infringement damages does not undercut the effectiveness of an assignment. See Rude, 130 U.S. at 163; Vaupel, 944 F.2d at 875.
 
 
 24
 Similarly, contrary to the district court's ruling, the agreement between SGS and SGS-France and SGS-Italy that SGS would assign the patents back at the conclusion of this litigation does not invalidate the assignments. This court and other courts have held that an assignment that explicitly provides for possible transfer back to the assignor is nevertheless effective to give the assignee standing. See Vaupel, 944 F.2d at 875 (explicit termination provisions in the agreement were "entirely consistent with an assignment"); Discovery Rights, Inc. v. Avon Prods., Inc., 182 USPQ 396, 397-98 (N.D.Ill.1974) (assignee's title to a patent was not called into question even though assignor retained right to reacquire title to the patent should the assignee desire to acquire new licensees). Moreover, in the present case, there is only an agreement to reassign the '513 and '127 patents, not an actual reassignment. Thus, SGS appears to have standing to sue.
 
 
 25
 Finally, the district court erred in granting summary judgment on the ground that the assignments of the '127 and '513 patents were shams because the sole purpose of the assignment was to facilitate litigation. In so ruling, the trial court ignored the express language in the assignments and in effect created a new requirement, not found in any case law, that a patent assignment must have an "independent business purpose." See Appendix at 66. The motive or purpose of a patent assignment is irrelevant to the assignee's standing to enforce the assigned patent. Even a motive solely and expressly to facilitate litigation "is of no concern to the defendant and does not bear on the effectiveness of the assignment." Discovery Rights, 182 USPQ at 398.
 
 
 26
 In Rawlings v. National Molasses Co., 394 F.2d 645, 648, 158 USPQ 14, 16 (9th Cir.1968), the Ninth Circuit assumed that the assignment between the plaintiff and the assignor "was accomplished for the sole purpose of permitting plaintiff to bring this action without joining [the assignor]...." Nevertheless, the court rejected the argument that this motive made the assignment a sham, stating that "the purpose underlying [the assignment's] execution is of no concern to the defendants." Id.
 
 
 27
 Similarly, in Seibert Cylinder Oil Cup Co. v. Phillips Lubricator Co., 10 Fed. 677 (Mass Cir.Ct.1882), the court stated:
 
 
 28
 The assignment to the plaintiffs was made an assignment, rather than a license, in order that they might sue in their own names--so the contracts recite; but there is no legal objection to this: the motive is not material, and, the whole legal title being in the plaintiffs, they may maintain this suit without joining the patentees.
 
 
 29
 Thus, for the foregoing reasons, we vacate the district court's grant of summary judgment, which was based upon the court's determination that SGS lacked standing to enforce the '127 and '513 patents because their assignments were sham.
 
 
 30
 III. Inequitable Conduct.
 
 
 31
 In response to SGS's claim of infringement of the '314 patent, IR raised the affirmative defense of inequitable conduct. IR also filed a motion for summary judgment, arguing that various patent attorneys as well as inventor T.C. Chan had engaged in inequitable conduct by failing to disclose United States Patent No. 3,913,126 (the Hooker patent) to the PTO. IR contended that each of these individuals knew of the Hooker patent because it had been cited during the prosecution of another patent, United States Patent No. 4,179,311 (the Athanas patent), in which each allegedly had been involved, and that Hooker was material to the '314 claims. SGS argued otherwise. The district court granted summary judgment in IR's favor on the inequitable conduct issue. On appeal, SGS contends that there are genuine issues of material fact as to the intent of the patent attorneys, the intent of the inventor, and the materiality of the undisclosed Hooker patent.
 
 
 32
 This court reviews the district court summary judgment decision de novo. See, e.g., Paragon Podiatry Lab. v. KLM Labs., 984 F.2d 1182, 25 USPQ2d 1561 (Fed.Cir.1993). Inequitable conduct requires a finding of both materiality of the undisclosed prior art and intent to mislead the examiner. Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872, 9 USPQ2d 1384, 1389 (Fed.Cir.1988), cert. denied, 490 U.S. 1067 (1989). A piece of prior art is material if there is a "substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. Sec. 1.56(a); Halliburton Co. v. Schlumberger Technology Corp., 925 F.2d 1435, 1440, 17 USPQ2d 1834, 1839 (Fed.Cir.1991). The test for materiality is not whether there is anticipation or obviousness. See, e.g., A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1397, 230 USPQ 849, 853 (Fed.Cir.1986).
 
 
 33
 The invention claimed in the '314 patent teaches how to laterally undercut by etching with acid the insulating oxide layer to a depth that is equal to or greater than the thickness of the layer, and how to fill the undercut by growing oxide simultaneously from both the polysilicon layer and silicon wafer substrate of a semiconductor device at high temperatures to fill the undercut of the polysilicon gate layer.
 
 
 34
 IR admitted and the district court found that Hooker does not expressly disclose these elements. The district court determined, however, that these elements are disclosed in the Hooker patent by reason of their "inherency."[3] In reaching this conclusion, the court resolved a material issue of fact against SGS, a result that is improper on summary judgment in the face of the contrary evidence. See Continental Can Co. v. Monsanto Co., 948 F.2d 1264, 1268-69, 20 USPQ2d 1746, 1749-50 (Fed.Cir.1991) (alleged inherency is an issue of fact) and KangaROOS U.S.A., Inc. v. Caldor, Inc., 778 F.2d 1571, 1573, 228 USPQ 32, 33 (Fed.Cir.1985) (trial court must view all evidence in a light most favorable to the nonmoving party and draw all inferences in favor of the nonmovant). Through the declarations of Dr. James A. Cunningham and Dr. T.C. Chan, SGS presented evidence specifically refuting the alleged "inherencies." See Appendix at 5251-55 and 5347-49. Dr. Cunningham explained that the Hooker process does not disclose an undercut of any particular depth and therefore does not disclose, by "inherency" or otherwise, the lateral undercut required by the claims of the '314 patent. Drs. Cunningham and Chan explained that the Hooker patent also does not disclose filling any such undercut by simultaneous growth of a substrate oxide and a peripheral edge polysilicon oxide because it contains no disclosure of the thickness of either the gate oxide or the thermally-grown oxide. At a minimum, these declarations raise genuine issues of material fact, making summary judgment inappropriate.
 
 
 35
 As to intent to deceive, it is difficult to tell whether any of the individuals accused of inequitable conduct possessed the requisite knowledge and intent. IR argues and the district court found that the patent attorneys knew about the materiality of the Hooker patent through their involvement in the prosecution of the Athanas patent in which Hooker was cited as prior art. Yet, according to IR, these attorneys intentionally failed to disclose this reference to the examiner.
 
 
 36
 IR also contends that inventor Chan had the opportunity to review the Hooker patent in connection with the Athanas prosecution, was aware of its materiality, and also intentionally failed to disclose it to the PTO. SGS, of course, argues that neither the patent attorneys nor inventor Chan saw the relevance or connection between the Hooker patent and the '314 patent. Because both sides presented conflicting evidence, genuine issues of material fact remained, and we do not see how the district court could have properly granted summary judgment in IR's favor. Accordingly, we vacate the district court's ruling on the inequitable conduct issue.
 
 
 37
 IV. Obviousness.
 
 
 38
 Finally, IR cross-appeals the California district court's denial of summary judgment that the '314 patent is anticipated by or rendered obvious in view of the Hooker patent and Japanese Patent Application 47-2079 (the "NEC application").
 
 
 39
 A comparison of the process claimed in the '314 patent with the prior art reveals that the only step alleged to be new is the filling of the known undercut in the oxide under a polysilicon gate with a thermally grown oxide, rather than with a prior art deposited oxide. IR argues that, as a matter of law, that step was not new because it was inherent in the process disclosed in the prior art Hooker patent.
 
 
 40
 Before a reference can be found to disclose a feature by virtue of its inherency, one of ordinary skill in the art viewing the reference must understand that the unmentioned feature at issue is necessarily present in the reference. Continental Can, 948 F.2d at 1268-69, 20 USPQ2d at 1749-50. The test of inherency is not satisfied by what a reference "may" teach. Id., 20 USPQ2d at 1749-50 ("Inherency ... may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.") (emphasis added). SGS presented evidence from Drs. Chan and Cunningham that the Hooker patent would not have disclosed complete filling of the undercut. Thus, construing, as it must, all the evidence in a light most favorable to the nonmoving party, the district court properly denied summary judgment that the Hooker patent anticipated the '314 invention.
 
 
 41
 Nor does the NEC prior art reference anticipate the claimed invention. Although NEC expressly describes an undercut, specifies the precise lateral extent of the undercut claimed in the '314 patent and prescribes as the solution to the undercut problem the complete filling of the undercut with grown oxide, it is not enabling. NEC describes a process of filling an undercut by growing an oxide layer and then etching away that layer, leaving intact a supposed plug of the undercut. According to Dr. Cunningham, however, one of ordinary skill practicing the NEC process would not be able to effect a fill of the undercut.
 
 
 42
 After growing the oxide layer to plug the undercut, one skilled in the art performing the steps taught by NEC would need to etch the device a second time with acid to eliminate the oxide from the substrate surface. This second etching, however, would re-introduce undercut in the oxide layer underneath the gate. As Cunningham explained, the reason for this is that the oxide layer varies in thickness, and certain parts of the oxide layer, including the oxide plug which filled the original undercut, will necessarily be over-etched in order to ensure the complete removal of oxide from the substrate surface. Thus, the undercut would once again be left unfilled.
 
 
 43
 IR responds that NEC teaches more than the '314 by the addition of a second etching, and although NEC may have failed in its attempt to achieve a successful second etching, the NEC disclosure still anticipates each of the process steps called for by the claims of the '314 patent (i.e., it still teaches how to plug the undercut).
 
 
 44
 We disagree with IR's analysis. The NEC disclosure does not teach more than the '314 invention. In fact, it fails to teach even the claimed invention. The second etching is a necessary step in order to produce a plugged undercut and a clean substrate surface. Because the NEC process does not fully fill the undercut, it is not enabling to one skilled in the art and cannot anticipate the claimed invention. Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 18 USPQ2d 1001 (Fed.Cir.1991).
 
 
 45
 Finally, IR contends that the '314 invention would have been obvious in view of Hooker and NEC. In order to render a claimed invention obvious, however, this court held in Beckman Instruments v. LKB Produkter AB, 892 F.2d 1547, 1551, 13 USPQ2d 1301, 1304 (Fed.Cir.1989), that the prior art must enable one skilled in the art to make and use the invention. Even if there was a suggestion to combine the Hooker and NEC prior art references, construing all the evidence in a light most favorable to the nonmoving party as the district court must on summary judgment, these two disclosures do not enable one skilled in the art to make the claimed invention. Accordingly, the district court's denial of IR's summary judgment motion of invalidity based on anticipation and obviousness was proper.
 
 
 46
 V. Citation to Nonprecendential Decision.
 
 
 47
 Finally, both SGS and IR cited in their briefs the nonprecedential decision Katz v. Lear Siegler, Inc., 1993 U.S.App. Lexis 17507 (Fed.Cir. July 12, 1993).[4] Not only do the citations of a nonprecedential case constitute clear violations of Federal Circuit Rule 47.6(b), but, as cited by the parties, they are miscitations because they do not acknowledge the nonprecedential status of the case. That is, they omit "(table)." At the very least, this is misleading to the court, and we condemn such behavior.
 
 CONCLUSION
 
 48
 For the reasons articulated above, we (1) reverse the Texas district court's transfer of this case to California pursuant to 28 U.S.C. Sec. 1406(a) and remand this action to the Central District of California for further proceedings; (2) vacate the District Court for the Central District of California's entry of summary judgment in favor of IR, dismissing for lack of standing SGS's claims for infringement of the '513 and '127 patents assigned to SGS by affiliated companies on the ground that the assignments were shams; (3) vacate the District Court for the Central District of California's entry of summary judgment in favor of IR on SGS's claim for infringement of the '314 patent on the ground that the patent had been procured through inequitable conduct; and (4) affirm the California district court's denial of summary judgment that the '314 patent is anticipated by or rendered obvious in view of certain prior art.
 
 COSTS
 
 49
 Each party to bear its own costs.
 
 
 50
 PLAGER, Circuit Judge, concurring.
 
 
 51
 I concur in and join parts II, III, IV, and V of the opinion, and in the decision to vacate and remand to the California District Court. With regard to the earlier transfer decision of the Texas District Court, I do not find that issue has been properly appealed to this court--see Order dated February 11, 1992 and 15 Charles A. Wright et al., Federal Practice and Procedure, Sec. 3846 (1986)--and would simply dismiss that aspect of the appeal.
 
 
 52
 Following release of the opinions in this case, National Semiconductor moved the court under Fed.Cir. R. 47.6(c) to reissue the opinions as a precedential disposition. The panel unanimously denied the motion, but the panel issued over my objection an errata sheet amending Part I of the majority opinion. Prior to amendment, the sentence in the opinion bridging pages 3-4 stated the principle that, under 35 U.S.C. Sec. 271(g), the sale of a product made using a patented process is an act of infringement. This was in reference to the accused product made in the United States. Consistent with the statute, the opinion made no distinction between a product made within or without the United States.
 
 
 53
 The amendment to the opinion changed the statutory authority for that proposition from Sec. 271(g) to Sec. 271(a). With the amendment, the sentence now relies on 35 U.S.C. Sec. 271(a) for the assertion that the sale of a product made in the United States by a patented process is not an act of infringement. The clear implication is that Sec. 271(g) does not mean what it says. I believe that is not correct, and though recognizing that the opinion cannot be cited as authority, nevertheless feel that we should not leave the bar with that impression.
 
 
 54
 35 U.S.C. Sec. 271(a) makes the act of making, using, or selling a patented invention an act of infringement. Under this provision, the use of a patented process to make a product is infringement, but the sale of a product made by a patented process in itself is not. See e.g., United States v. Studiengesellschaft Kohle a.b.H., 670 F.2d 1122, 1127-28, 212 USPQ 889, 895 (D.C.Cir. 1981). Indeed, this gap in coverage was the reason why Congress enacted 35 U.S.C. Sec. 271(g) in the first place. H. Rep. No. 100-60, 100th Cong., Sec.st Sess., at 5 (1987).
 
 
 55
 The languate of 35 U.S.C. Sec. 271(g) specifically covers the situation involved in this case. According to that language, it is an act of infringement to imoort or sell or use in the United States a product made by a patented process.[1] When "the language of the statute is clear and fits the case, the plain meaning of the statute will be regarded as conclusive." VE Holding Corp v. Johnson Gas Appliance Co., 917 F.2d 1574, 1579, 16 USPQ2d 1614, 1618 (Fed.Cir. 1990), cert. denied, 499 U.S. 922 (1991).
 
 
 56
 This conclusion is fully supported by the legislative history of 35 U.S.C. Sec. 271(g). In 1983-1984, when Congress first considered expanding the scope of process patent protection, several of the bills submitted in relation to this issue were limited to a product "made in another country." Eg., S. 1535, 98th Cont., 1st Sess. Sec. 1 (1983) (bill submitted by Senators Mathias, Dole, and DeConcini, June 23, 1983; H.R. 6286, 98th Cong., 2d Sess. Sec. 101(a) (1984) (bill introduced by Mr. Kastenmeier et al., September 20, 1984).
 
 
 57
 Congress' initial focus was clearly on products made abroad by a patented process. However, Congress later broadened its focus to include products made in the United States, in order to avoid any appearance of discrimination against foreign manufacturers. S. Rep. No. 98-663, 98 Cong. 2d Sess., at 5 (1984). As the Senate Report accompanying the revised S. 1535 extended only to products made in another country and subsequently imported into the United States. The language adopted by the Committee is broader, covering products made by the patented process either in the United States or abroad." Id.; see also H. R. Rep. No. 99-807, 99th Cong., 2d Sess., at 11 (1986) ("These [revised] bills do not distinguish between products made using a patented process within the United States and those made outside the United States.").
 
 
 58
 Thus, the bills were either amended or reintroduced to eliminate the limitation. The change was carried over into the statute as it was enacted. Threre can be little question that the panel opinion was correct when it initially cited Sec. 271(g) as authority for the proposition stated; the change was unnecessary and possibly confusing.
 
 
 
 [1]
 IR disagrees, and argues that it sold its products to independent distributors in California who in turn sold them to customers in Texas. IR, however, also sold accused products to distributors located in Texas, knowing and intending that they would sell those products to Texas customers. Thus, for jurisdictional purposes, the technical location of IR's sales transactions is not relevant
 
 
 [2]
 At the time, its motion for fees was not so titled or characterized
 
 
 [3]
 More specifically, although ST acknowledges that two elements of the '314 patent--lateral oxide undercutting in the specific dimension prescribed by the '314 claims and complete filling of the undercut--are not disclosed by Hooker, IR argues: (1) that undercutting is "incident to opening diffusion windows [by etching]," see Appendix at 25 n. 16 and 7785; (2) that Hooker discloses the growth of an oxide at the precise step in the manufacturing process where the '314 patent grows oxide to fill the undercut; (3) that "it is general practice to over etch" and over etching would create an undercut "typically somewhat greater than the thickness of [the] thermal oxide layer," see Appendix at 4418; and (4) that Hooker's Figure 7 shows the grown oxide to a depth sufficient to completely fill the undercut, see Appendix at 28 and 5252
 SGS concedes that Hooker inherently discloses: (1) an undercut in the oxide beneath the polysilicon gate; and (2) the growth of an oxide in that undercut. SGS adds, however, that Hooker does not disclose: (1) that the polysilicon gate is laterally undercut by the amount claimed in the '314 (i.e., an amount at least equal to the thickness of the gate oxide layer); or (2) that the undercut has been completely filled with grown oxide.
 
 
 [4]
 Although counsel for SGS stated in oral argument that he only cited the case in response to IR's citation of the case, we do not find this to be the case. SGS subsequently cited Katz v. Lear Siegler, Inc. for a wholly different, unrelated proposition than had IR. Thus, SGS is just as culpable as IR